**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **DANIEL SWEAR** | : | **CASE NUMBER: 2:15-cv-06591** |
| | : | |
| | : | **SECTION "G"** |
| **VERSUS** | : | **HON. JUDGE BROWN** |
| | : | |
| | : | **MAGISTRATE** |
| **LAWSON, et al.** | : | **HON. JUDGE van MEERVELD** |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT 1

# DECLARATION OF DAVID BRIAN HEINTZ

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **DANIEL SWEAR** | : | CASE NUMBER: 2:15-cv-06591 |
| | : | |
| | : | SECTION "G" |
| **VERSUS** | : | HON. JUDGE BROWN |
| | : | |
| | : | MAGISTRATE |
| **LAWSON, et al.** | : | HON. JUDGE van MEERVELD |

## DECLARATION OF DAVID BRIAN HEINTZ

This declaration is made in accordance and conformity with 28 U.S.C. 1746. I, David Brian Heintz, do hereby declare, certify, verify and state under penalty of perjury that the foregoing is true and correct based on my personal knowledge, as follows:

1. My name is David Brian Heintz. I was born on ▓▓▓▓ 1969. My address is 121 Creagan, Gretna, Louisiana 70053.

2. I began my law enforcement career in 1991. I was in class 16 of the Gretna, Police Department.

3. I worked as reserve officer for approximately 2 years before I became full time with Jefferson Parish Sheriff in 1993.

4. In April of 2006, I became an officer first class with the Gretna Police Department.

5. I stayed employed with the Gretna Police Department until January 2017. At the time that I left I was the rank of Sergeant. I left the Gretna Police

_DH_ Initials              1
10-1-17 Date Executed

Department because I was afraid that I would be fired because I was told that any infraction would have lead to my termination.

6. For an officer, if they were terminated then it would affect their ability to be hired with another police department. Disciplinary actions also affect an officer's ability to be hired with another police department.

7. At the time that I left the Gretna Police Department, I was a Sergeant over a patrol division/team. I was originally over the D team and then I moved to Sergeant over the C team.

8. I was the Sergeant over the C team when Daniel Swear was a member of the team.

9. At the time that Daniel Swear was on the C team, Danielle Rodriguez was also a Sergeant over the C team.

10. I am aware of a quota system, which was enforced at the Gretna Police Department in 2014 and 2015. I am aware of a quota system being in place with Gretna Police Department since at least 2007. I was directed by Gretna Police Department officials to write up officers for "unsatisfactory performance" for failure to meet the department's quota policy.

11. In 2007, I went to the day shift in which Jarvis Jackson was Lieutenant. At that time, I was required to have 2 citations per shifts.

12. I was written up in October of 2007 for "unsatisfactory performance" for failing to meet the required 2 citations per shift.

13. I was again written up in November of 2007 for "unsatisfactory performance" for failing to meet the required 2 citations per shift. I took the

_____ Initials
10-1-17 Date Executed

2

write up to Marty Schimdt with Internal Affairs Division. I was advised by Mr. Schmidt that the write up would not go into my personnel file.

14. At this time in 2007, Arthur Lawson was Chief of Police and Anthony Christiana was the rank of Major with the Gretna Police Department.

15. In 2008 I was promoted to Sergeant. I worked under Scott Vinson who was a Lieutenant. At this time in 2008 we were required to have citations in double digits.

16. Scott Vinson became commander of the patrol division of the Gretna Police Department.

17. We were required to meet a standard quota of 10 – 2 – 2. It was my understanding that the 10-2-2 quota had been with the Gretna Police Department since before I began to work at the department. The 10-2-2 quota meant, that patrol officers were required to have 10 items, 2 citations and 2 arrests per shift, which had to equal to the required total by the end of the month.

18. My role as a Sergeant was to supervise my patrolmen. I had to make sure they patrolled the neighbors, keep the residences safe.

19. As a shift supervisor was required to keep statics of subordinate officers. I would give the statics to Lieutenant Scott Vinson. Curtis Snow would compile the statics at the end of the month.

20. In 2014 and 2015 as a Sergeant we had access to stat sheets from all teams.

21. In approximately November or early December we had a supervisor meeting with Scott Vinson in which we were advised that we needed to come up with



____ Initials
____ Date Executed

3

a game plan on how to run our shifts more productively. It was clear that since officers were rated by arrest and tickets that we were expect to push our teams to achieve a greater number tickets and arrest.

22. In response to this request I sought advice because I did not want to push a quota system because I did not agree with it. I determined that the best way to attempt to comply with this directive was to just tell my team that they needed to increase productivity 10% by making more stops, not necessarily giving more tickets or making more arrests.

23. I was present in a meeting in December of 2014, after we had the supervisors meeting when Scott Vinson personally addressed the C team. At this meeting we were told that we needed to subsidize the possible loss of the revenue from the Redflex Cameras. We were advised by Scott Vinson that this directive came straight from the Chief. We were told to be more protective, in order to increase revenue by means of making more arrest and writing more tickets.

24. It was at this December 2014 meeting that I told the C Team to strive to achieve 10% more productivity per shift because I did not want to push the quota.

25. As a supervisor who was responsible for C Team, I was unaware of any allegation that the officers were working only one and half hours per shift as being the basis for this December meeting with Scott Vinson. As a sergeant over the C team I would have expected that if there were the belief that my

 Initials
Date Executed

4

team was only working this amount of time that this would have brought to my attention because I was responsible for over seeing the team.

26. Scott Vinson told me that we as supervisors would be held accountable if the numbers slipped. To my knowledge after that meeting, more officers began to get written up for failing to meet the 10-2-2 quotas.

27. Daniel Swear spoke to me about being against the quota system before his meeting with Daniel Rodriguez in December 2014. I told him about my experience of being written up failing to meet the required quota at the Gretna Police Department.

28. I saw the license plate that had the Statute of Illegal Quotas on it on Daniel Swear's personal vehicle while he was still working at the Gretna Police Department.

29. I felt as though I was passed up for a promotion in January of 2015 because I refused to discipline my team for not meeting the Gretna Police Department quota.

30. As a joke, Daniel Swear, gave me kneepads, a bottle of Jack Daniels, a jar of Vaseline and ink pen refills because I was passed over for the promotion. The ink pen refills were given so I could do more write-ups for my team not doing their jobs in reference to the quota. Daniel Rodriguez came to me that night and told me that she thought that his joke was inappropriate. I told her that I would talk Daniel about it. I had no intension of writing him up for the incident because I thought that incident was funny and it was not detrimental to anyone who was present.

 Initials           5
10-1-17 Date Executed

31. As with any other directive from superiors, officers were expected to follow the Gretna Police Department quota regardless of whether it was written or oral.

32. Scott Vinson sent all patrol supervisors the photographs of the dry erase board that were in his office. Some of these photographs are attached as Exhibits 1 and 2. This dry board was plain view of all people walking by Scott Vinson's office.

33. This dry erase board was used by Scott Vinson to keep track of the officer stats. It was apparent that the red checks on the dry erase board meant that officer failed to meet the quota requirement. If the officer did meet the quota requirement there would be a green star or check next to the officers' name.

34. As a supervising officer I had access to the officer stat sheets.

35. In these stat sheets, Scott Vinson would identify any deficiency in red. When I check, these stars and checks correlated with the officers' stat sheets. I attached as Exhibit 3 a copy of Lloyd II, April 2015 stat sheet showing the red line deficiency in red that corresponds to Exhibit 1.

36. Exhibit 2 was sent to the supervisors showing that Scott Vinson was starting his tracking of the next period.

37. I was aware that following the death of Gretna Police Department's Chief Arthur Lawson's son in 2010, Chief Arthur Lawson was absent from the department on a regular basis for almost 3 years. To my knowledge he would spend a substantial amount of time at his home in Orange Beach, Alabama.

 Initials
Date Executed

6

38. I was on nights for almost 10 years and I only saw Chief Arthur Lawson at major crime scenes and occasionally at functions.

39. When Chief Arthur Lawson was absent, Deputy Chief Anthony Christiana was in charge of the department. If both Chief Arthur Lawson and Deputy Chief Anthony Christiana were absent, then Captain Russell Lloyd was left in charge of the department.

40. I had an interaction with Deputy Chief Anthony Christiana in which he asked me what was the Gretna Police Department policy in reference to domestic violence. I explained to him that the department policy dictated that an arrest be made. Deputy Chief Christiana told me that he had the authority to rewrite department policy if necessary.

41. I have listened to the audio recording identified as 1-7-14 Evaluation attached as Exhibit 1 to the Declaration of Paul Pichoff. I am personally familiar with the voices of the people in the audio recording and can identify them as Paul Pichoff, J.R. Rogers and Philip Saladino.

**DONE AND SIGNED** this 1st day of October 2017, in Harvey Louisiana.

_____
David Brian Heintz

DH Initials
10-1-17 Date Executed

7



| Name | JAN | FEB | MAR | APR | MAY | JUNE |
|---|---|---|---|---|---|---|
| C. DOUGHERTY | ★ | ★ | ★ | ★ | ★ | ✓ |
| D. BARTLETT | ★ | ✓ | ★ | ★ | ★ | ★ |
| B. MILLER | ★ | ★ | ★ | ★ | ★ | ★ |
| T. HENRY 21 | N/A | N/A | N/A | N/A | N/A | ✓ |
| D. ALFARO | ✓ | ✓ | ★ | ✓ | ★ | ★ |
| C. BOUDREAUX | ★ | ★ | ★ | ★ | ★ | ★ |
| R. FAISON ● | N/A | N/A | ★ | ✓ | ✓ | ✓ |
| C. ARABIE | ✓ | ★ | ✓ | ✓ | ✓ | ✓ |
| M. STACY | ★ | ★ | ✓ | ★ | ★ | ★ |
| C. FREENEY ● | ✓ | ✓ | ✓ | ✓ | ★ | ✗ |
| D. COSTA | ★ | ★ | ★ | ★ | ★ | ★ |
| R. LLOYD II | ✓ | ★ | ★ | ✓ | ★ | ✓ |
| B. LEGNON | ★ | ★ | ★ | ★ | ★ | ★ |
| J. LOUIS | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| S. VERRETT | ✓ | ✓ | ★ | ✓ | ✓ | ★ |
| B. CHERAMIE | ★ | ★ | ★ | ★ | ★ | ★ |
| J. DUFRENE 110 | N/A | N/A | N/A | N/A | N/A | N/A |
| V. PAZ | ★ | ★ | ★ | ★ | ★ | ★ |
| J. MATTE ● | ✓ | N/A | N/A | ✓ | ✓ | ✓ |
| A. NEVEAUX 49 | N/A | N/A | N/A | N/A | N/A | ✓ |
| K. ARABIE | ✓ | ★ | ★ | ★ | ★ | ★ |
| M. KRALY 38 | N/A | N/A | N/A | N/A | N/A | ★ |
| R. WALLOW | N/A | N/A | ★ | ★ | ★ | ★ |
| R. MEKDESSIE | ✓ | ★ | ★ | ★ | ★ | ★ |
| A. FERNANDEZ | ✓ | ★ | ★ | ★ | ★ | ★ |
| C. MAYNARD | ✓ | ★ | ★ | ★ | ★ | ★ |
| C. NEWBY | ✓ | ★ | ★ | ★ | ★ | ★ |
| A. CHOPIN 100 | N/A | N/A | N/A | N/A | N/A | ★ |

EXHIBIT 1



|  | 1/21 3 | 0/18 5 | 3/15 5 | 1/17 5 | 4/18 5 |  |
|---|---|---|---|---|---|---|
|  | JULY | AUG | SEPT | OCT | NOV | D |
| J. MATTE | N/A |  |  |  |  |  |
| D. BARTLETT | ★ |  |  |  |  |  |
| B. MILLER | ★ |  |  |  |  |  |
| T. HENRY | ★ |  |  |  |  |  |
| D. ALFARO | ✓ |  |  |  |  |  |
| C. BOUDREAUX | ★ |  |  |  |  |  |
| R. FAISON | ★ |  |  |  |  |  |
| C. ARABIE | ★ |  |  |  |  |  |
| M. STACY | ★ |  |  |  |  |  |
| C. FREENEY | ✓ |  |  |  |  |  |
| D. COSTA | ✓ |  |  |  |  |  |
| R. LLOYD II | ★ |  |  |  |  |  |
| B. LEGNON | ★ |  |  |  |  |  |
| J. LOUIS | ★ |  |  |  |  |  |
| S. VERRETT | ✓ |  |  |  |  |  |
| B. CHERAMIE | ★ |  |  |  |  |  |
| J. DUFRENE | N/A |  |  |  |  |  |
| V. PAZ | ★ |  |  |  |  |  |
| M. DUNNE | N/A |  |  |  |  |  |
| A. NEVEAUX | ★ |  |  |  |  |  |
| K. ARABIE | ★ |  |  |  |  |  |
| M. KRALY | ★ |  |  |  |  |  |
| R. WALLOW | ★ |  |  |  |  |  |
| R. MEKDESSIE | ★ |  |  |  |  |  |
| A. FERNANDEZ | ★ |  |  |  |  |  |
| C. MAYNARD | ★ |  |  |  |  |  |
| C. NEWBY | ★ |  |  |  |  |  |
| A. CHOPIN | ★ |  |  |  |  |  |

EXHIBIT 2

# MONTHLY TEAM STATISTICS — 2015 — LLOYD II

| # | Category | W 1 | T 2 | F 3 | S 4 | S 5 | M 6 | T 7 | W 8 | T 9 | F 10 | S 11 | S 12 | M 13 | T 14 | W 15 | T 16 | F 17 | S 18 | S 19 | M 20 | T 21 | W 22 | T 23 | F 24 | S 25 | S 26 | M 27 | T 28 | W 29 | T 30 | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | TOTAL COMPLAINTS | | | V | V | V | | | 6 | 3 | | | 4 | 2 | | | 9 | 9 | 4 | | | 9 | 5 | | | | 3 | 8 | | | 99 |
| 2 | NON-RTF'S | | | A | A | A | | | 1 | | | | | | | | 9 | 9 | | | | 9 | 1 | | | | 20 | 9 | | | 57 |
| 3 | OLD COMPLAINTS | | | C | C | C | | | | | | | | | | | | | | | | | C | | | | | | | | 3 |
| 4 | ASSISTS | | | A | A | A | | | 5 | 4 | | | 3 | 5 | | | 10 | 6 | | | | 6 | K | | | | 3 | 1 | | | 42 |
| 5 | ARMMS | | | T | T | T | | | 1 | 1 | | | 2 | | | | | | 1 | | | | | | | | 1 | | | | 5 |
| 6 | SUPPLEMENT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 7 | VEHICLE STOLEN | | | I | I | I | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 8 | VEHICLE RECOVERY | | | O | O | O | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 9 | ACCIDENT | | | N | N | N | | | | | | | | | 1 | | | | 1 | | | | | | | | 1 | | | | 3 |
| 10 | SUMMONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 11 | WARRANT/ATTACHMENT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 12 | FELONY ARREST | | | | | | | | | | | | | | | | | | | | | | | | | | | 15 | 1 | | | 34 |
| 13 | MISDEMEANOR ARREST | | | | | | | | | 1 | | | 3 | | | | | | | | | | | | | | | 1 | | | | 4 |
| 14 | DWI ARREST | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 15 | JAR FELONY | | | | | | | | 4 | 9 | | | 5 | | | | | | | | | | | | | | | | | | | |
| 16 | JAR MISDEMEANOR | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 17 | **CITATIONS** | | | | | | | | 2 | | | | 3 | | | | 2 | 4 | 4 | | | 2 | | | | | 2 | 5 | | | 24 |
| 18 | RADAR CITATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 19 | PARKING CITATIONS | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| 20 | WARNING CITATIONS | | | | | | | | 1 | | | | | | | | | | | | | | | | | | | | | | | |
| 21 | LICENSE PLATE | | | | | | | | 3 | 4 | | | 3 | 1 | | | 2 | 2 | 3 | | | 5 | | | | | 5 | 2 | | | 28 |
| 22 | BUSINESS CHECK | | | | | | | | | | | | | | | | | | | | | | 6 | | | | | | | | | 16 |
| 23 | RESIDENCE CHECK | | | | | | | | | | | | | | | | 2 | 2 | 1 | | | | | | | | 2 | | | | |
| 24 | VEHICLE CHECKS | | | | | | | | 1 | 1 | | | | 2 | | | 1 | | | | | | | | | | | | | | |
| 25 | VEHICLE TAGGED | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 26 | VEHICLE TOWED | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| 27 | PEDESTRIAN CHECK | | | | | | | | | | | | | | | | 1 | 2 | | | | 2 | | | | | 1 | 1 | | | 2 |
| 28 | FIELD INTERVIEW CARDS | | | | | | | | | 1 | | | | 1 | | | 1 | | | | | | | | | | 1 | | | | 9 |
| 29 | LITTERING | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 30 | REFERRALS | | | | | | | | 1 | 1 | | | 1 | 1 | | | 1 | 1 | 1 | | | 1 | | | | | | | | | |
| 31 | WARRANT OBTAINED | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | DAYS WORKED | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 10 |



EXHIBIT 3