| | |
|---|---|
| **DANIEL SWEAR** | **CIVIL ACTION** |
| **VERSUS** | **NO. 15-6591** |
| **ARTHUR LAWSON, et al.** | **SECTION: "G"(1)** |

## <u>ORDER</u>

In this litigation, Plaintiff Daniel Swear ("Plaintiff"), a former Gretna police officer, asserts claims against Defendants Arthur Lawson ("Lawson"), the Chief of the Gretna Police Department; Scott Vinson ("Vinson"), the Captain of the Patrol Division of the Gretna Police Department; and the City of Gretna (collectively, Defendants). Plaintiff claims that Defendants generally violated his First and Fourteenth Amendment rights by disciplining Plaintiff for failing to comply with the Department's alleged quota system and constructively discharging Plaintiff for speaking out against the alleged quota system. Plaintiff brings claims for violations of his constitutional rights pursuant to 42 U.S.C. § 1983 against the City of Gretna and against Vinson and Lawson in their individual and official capacities. Plaintiff also claims that Defendants violated Louisiana Revised Statute 23:967, which prohibits employer retaliation against whistleblowers, by constructively discharging him for speaking out against the unlawful quota system.[1]

Pending before this Court is Defendants' motion for summary judgment, wherein Lawson and Vinson assert that they are entitled to qualified immunity on all claims against them in their individual capacities. Defendants also argue that they are not liable under 42 U.S.C. § 1983

---

[1] Rec. Doc. 1.

because Plaintiff points to no evidence showing that he was not permitted to freely speak out against the alleged quota system, which they deny exists, or that Defendants in any other way interfered with Plaintiff's ability to speak out against the alleged quota system.[2] Defendants further argue that no retaliation against Plaintiff took place because Plaintiff resigned by his own free will, as a result of poor job performance.

Having considered the motion, the complaint, the memoranda in support and opposition, oral argument, and the applicable law, the Court will grant the motion, in part, to the extent that Lawson is entitled to qualified immunity; Plaintiff's Section 1983 first amendment retaliation claims against Lawson and Vinson in their official capacities mirror Plaintiff's Section 1983 first amendment retaliation claim against the City of Gretna, so those claims against them are dismissed on that ground; and because Plaintiff has abandoned his 14th Amendment claim, it is dismissed. Furthermore, the Court will deny the motion, in part, to the extent that Plaintiff has identified disputed issues of material fact as to Vinson's entitlement to qualified immunity, Plaintiff's Section 1983 claim against the City of Gretna, and Plaintiff's Louisiana whistleblower claim, such that determination is not appropriate at the summary judgment stage.

## I. Background

### A.      Factual Background

In connection with their motion for summary judgment, Defendants provide seven statements of "facts not in dispute," upon which they rely in requesting judgment as a matter of law:[3]

---

[2] Rec. Doc. 31.

[3] Rec. Doc. 31-21.

1. Plaintiff, Daniel Swear, was employed by the City of Gretna as a commissioned police officer from December 2010 until he resigned in February 2015.

2. On August 6, 2014, Mr. Swear was placed on a three-day suspension for failing to adhere to Departmental Regulations arising from an incident on July 24, 2014.

3. On or about December 17, 2014, Mr. Swear attended a meeting with one of the four patrol divisions of the Gretna Police Department and Captain Vinson.

4. He was reprimanded for unsatisfactory performance by Sgt. Danielle Rodriguez.

5. On January 27, 2015, during roll call, Mr. Swear presented a colleague with gifts that implied that he would need to perform sexual favors after being passed over for promotion.

6. On February 2, 2015, Mr. Swear executed the Rights Relative to Administrative Proceedings Form and was officially reprimanded for the January 27, 2015 incident.

7. Plaintiff has NO evidence that Chief Lawson had any knowledge of a quota system, violated his Fourteenth or First Amendment Rights and further that he had only met Chief Lawson at a Christmas party.

Plaintiff admits statements 2, 3, and 6.[4] On October 3, 3017, Plaintiff filed his "Concise Statement of Fact Which Present Genuine Issues."[5] Defendants do not address the statements contained therein in any subsequent briefings. The parties clearly dispute the nature of the January 27, 2015 disciplinary action against Plaintiff; the circumstances of the meetings on December 2

---

[4] Rec. Doc. 35-8.

[5] Rec. Doc. 35-9 (Statement of Facts).

and December 9 leading to Plaintiff's termination of employment; whether a quota system was mandated by the Gretna Police Department; and whether Plaintiff's supervisors constructively discharged Plaintiff for speaking out against the alleged quota system.

In his Statement of Facts, Plaintiff alleges that on or about December 17, 2014 and/or December 19, 2014, Plaintiff attended a mandatory meeting of the Gretna Police Department, during which Plaintiff was informed that the Gretna Police Department was instituting a quota policy.[6] According to Plaintiff, the quota system mandated that each Gretna Police Officer issue three traffic citations and/or summons per day and an average of one arrest every two days worked.[7] Plaintiff alleges that police officers and their supervisors were subject to mandatory disciplinary action for any non-compliance with the quota system.[8] According to Plaintiff, the quota policy was overseen by Captain Vinson of the Gretna Police Department, and was known by the administration of the department, which would include Chief Arthur Lawson.[9]

Plaintiff avers that on December 20, 2014, he informed his supervisor, Sergeant Danielle Rodriguez, that implementation of the quota policy was expressly prohibited by state law pursuant to Louisiana Revised Statute 40:2401.1, and that he did not intend to participate in unlawful activity.[10] During the conversation on December 20, 2014, Plaintiff avers, Sergeant Rodriguez twice confirmed that the mandatory minimum quota of tickets to be issued by patrol officers was

---

[6] *Id.* at ¶17.

[7] *Id.*

[8] *Id.* at ¶¶7, 18.

[9] *Id.* at ¶5,

[10] *Id.* at ¶¶20–22, 24.

three per day.[11]

Plaintiff avers that Sergeant Rodriguez would hand out highlighted statistics during roll call, reflecting how many citations and arrests an officer had made in order to show them in what sections they were lacking and needed to improve before the end of the month.[12] Plaintiff avers that Vinson had a dry erase board in his office which listed the names of the patrol division and tracked their compliance with the mandatory quota policy.[13] Plaintiff further avers that the dry erase board was "in plain view of all people walking by Scott Vinson's office, including Chief Arthur Lawson and Deputy Chief Anthony Christiana."[14] Plaintiff also avers that Officer Paige Broulette was written up following the December 17 and/or 19, 2014 meeting for failing to meet the "policy, practice, and custom for institutionalized quotas."[15]

According to Plaintiff, in addition to informing his supervisor, Plaintiff spoke out against the quota system to fellow law enforcement officers of the Gretna Police Department.[16] Plaintiff avers that he also spoke out against the prohibited quota system to members of the public, including but not limited to, friends and family members.[17] Plaintiff also had a license plate made displaying the Louisiana Revised Statute regarding illegal quotas and attached it to his personal vehicle for

---

[11] *Id.* at ¶21.

[12] *Id.* at ¶23.

[13] *Id.* at ¶41.

[14] *Id.* at ¶42.

[15] *Id.* at ¶39.

[16] *Id.* at ¶26.

[17] *Id.*

the public to view.[18] Plaintiff additionally avers that he informed a special agent with the Federal Bureau of Investigation, stationed in the New Orleans office, of the implementation and administration of the quota system.[19] Plaintiff avers that he also notified the Louisiana Attorney General's Office regarding the implementation of the quota system.[20]

On February 2, 2015, Plaintiff alleges that he attended a meeting in the office of Captain Scott Vinson.[21] According to Plaintiff, also present in the meeting were Captain Russell Lloyd and two Sergeants.[22] At the meeting, Plaintiff alleges that he was threatened with termination if he failed to participate in and meet the assigned quota and was reprimanded for attempting to break the chain of command and speak to Deputy Chief Christiana directly.[23] Plaintiff alleges that Vinson also informed Plaintiff at the meeting that he would be demoted from his position as a Field Training Officer because his outspokenness concerning the illegal quota system could be spread to new officers coming into the department.[24] Plaintiff avers that immediately after the February 2, 2015 meeting, he tendered a written letter containing a two week notice of resignation from the Gretna Police Department.[25] Plaintiff avers that if he had been fired as opposed to

---

[18] *Id.* at ¶28.

[19] *Id.* at ¶27.

[20] *Id.* at ¶44.

[21] *Id.* at ¶32.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* at ¶33.

resigning it would have affected his ability to get employment in the future.[26]

On February 9, 2015, Plaintiff alleges, he attended a second meeting at the request of Captain Scott Vinson; and during the meeting, he was informed that he was being written up for making defamatory statements concerning the ethics of the Gretna Police Department.[27] According to Plaintiff, at the February 9, 2015 meeting, he was urged to resign immediately.[28] Plaintiff further alleges that while he was still employed by the Gretna Police Department, he was instructed that he needed to remove the license plate from his personal vehicle which referenced Louisiana Revised Statute regarding illegal quotas, and that the directive came from "someone above the rank of captain."[29]

On January 27, 2015, allegedly as a joke, Plaintiff gave one of his sergeants, David Heintz, kneepads, a bottle of Jack Daniels, a jar of Vaseline, and ink pen refills because he was passed over for a promotion.[30] Plaintiff alleges that he gave the ink pen refills to Sergeant Heintz so that he could issue more write-ups to his team for not meeting the quota.[31] Plaintiff was subsequently written up for the incident by Sergeant Rodriguez.[32]

---

[26] *Id.* at ¶34.

[27] *Id.* at ¶35.

[28] *Id.*

[29] *Id.* at ¶38.

[30] *Id.* at ¶30.

[31] *Id.*

[32] *Id.* at ¶31.

## II. Parties' Arguments

### A. *Defendants' Arguments in Support of the Motion for Summary Judgment*

#### 1. Defendants contend that they are entitled to summary judgment on Plaintiff's Section 1983 claims.

First, Defendants argue that Lawson and Vinson are entitled to qualified immunity for any Section 1983 claims against them in their individual capacities because neither Vinson nor Lawson violated Plaintiff's constitutional right to free speech.[33] Defendants do not dispute that Plaintiff has a First Amendment right to free speech or that Plaintiff's constitutional right to free speech was clearly established at the time of the alleged violation. However, they contend that Plaintiff cannot prove that his First Amendment rights were violated, as Plaintiff's deposition reveals that "(1) he spoke with family, (2) fellow officers, Lee Zurich, [sic] and the FBI, and (3) drove around town with a license plate bearing the Louisiana revised statute for a 'quota.'"[34] Therefore, Defendants argue that Plaintiff was allowed to freely exercise his First Amendment rights while employed by the Gretna Police Department.[35] Furthermore, Defendants assert, even if Plaintiff's clearly established constitutional right was violated, "the conduct of the defendants was not objectively unreasonable."[36]

Second, Defendants contend that the City of Gretna cannot be held liable for any actions of Lawson or Vinson, nor can Lawson be held liable for any actions of Vinson, under a theory of

---

[33] Rec. Doc. 31-1 at 9–11.

[34] *Id.* at 11.

[35] *Id.*

[36] *Id.*

*respondeat superior*, because the doctrine does not apply to Section 1983 claims.[37] Moreover, Defendants note that a supervisor who is not personally involved in the alleged acts causing the constitutional violation can only be liable if they failed to train or supervise the officers involved.[38] Defendants contend that there is no allegation that officers were improperly trained or supervised in this case.[39] Moreover, Defendants contend that the allegations of constitutional violations "do not apply to Arthur Lawson as Chief of Police or the City of Gretna at all."[40]

Third, Defendants note that Plaintiff's claims against Lawson and Vinson in their official capacities are really claims against the City of Gretna.[41] Even so, Defendants argue that Lawson cannot be found liable because he did not know of any "quota" policy, nor was he present during any discipline stemming from such a policy.[42] Likewise, Defendants argue that Plaintiff cannot show that Vinson's alleged discipline of Plaintiff was because of his failure to follow the alleged quota.[43]

Fourth, Defendants argue that Plaintiff's Section 1983 claim against the City of Gretna fails because Plaintiff has not shown that a "policy or custom" caused the alleged constitutional deprivation.[44] Defendants contend that the only "policy or custom" contemplated in Plaintiff's

---

[37] *Id.* at 11–12 (citing *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005)).

[38] *Id.* at 12 (citing *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)).

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.* at 12–13.

[43] *Id.* at 13.

[44] *Id.* (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

complaint is the alleged quota policy implemented by the Gretna Police Department.[45]  Defendants

argue that while no such policy exists, the existence of such a policy would be a violation of state

statutory law, not a constitutional violation.[46]  Because Plaintiff has not alleged that the Gretna

Police Department had a policy or custom of violating any constitutional rights, Defendants argue

that the City of Gretna cannot be held liable.[47]  Defendants further note that during his deposition

Plaintiff recounted at least three different purported standards of performance required by the

alleged quota policy.[48]  Therefore, by the nature of such variance, Defendants contend that no

policy or custom could have possibly been established.[49]  Moreover, even if a custom or policy

existed, Defendants argue, Plaintiff has not shown that the alleged quota system was the "moving

force" behind his alleged constitutional violations, and that municipal policymakers knew or

should have known of the alleged pattern of wrongdoing.[50]

Finally, Defendants argue that Plaintiff has failed to demonstrate a Section 1983 violation

of his First Amendment right to engage in protected speech or be free from retaliation.[51]

Defendants again argue that Plaintiff was not terminated by the Gretna Police Department but

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id* at 13–14.

[49] *Id* at 14.

[50] *Id.* at 16–17. Defendants also assert that Plaintiff's Section 1983 claims regarding alleged violations of his Fourteenth Amendment due process rights fail. *Id.* at 18. However, Plaintiff abandoned this claim during oral argument.

[51] *Id.* at 19–21.

resigned of his own free will.[52] Defendants additionally assert that neither Vinson nor Lawson ever interfered with Plaintiff's freedom of expression.[53] Moreover, they argue that because Plaintiff was not terminated, but voluntarily resigned, and his freedom of speech was not interfered with by Vinson or Lawson, Plaintiff has no claim against Vinson or Lawson that his First Amendment right to free speech was violated.[54]

Defendants contend that Plaintiff failed to even plead each element of a Section 1983 First Amendment retaliation claim, that: "(1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action."[55] Defendants argue that despite Plaintiff's allegations that he suffered an adverse employment action and that he spoke as a citizen on a matter of public concern, Plaintiff failed to even plead that his interest in the speech outweighs the government's interest in the efficient provision of policing the community of Gretna, and that the speech precipitated the adverse employment action.[56]

Furthermore, Defendants argue, Plaintiff's claim that he suffered an adverse employment action fails because the determinative factor of a constructive discharge is not the employer's intentions, but instead, the effect of the conditions on a reasonable employee.[57] Defendants aver

---

[52] *Id.* at 19.

[53] *Id.* at 19–20.

[54] *Id.* at 18–19.

[55] *Id.* at 20 (citing *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007)).

[56] *Id.*

[57] *Id.* at 20–21 (citing *Kelleher v. Flawn*, 761 F.2d 1079 (5th Cir. 1985); *Jett v. Dallas Indep. Sch. Dist.*, 798

that Plaintiff cannot meet his burden of showing that due to his exercise of free speech, the Department imposed conditions so intolerable that a reasonable person would have felt compelled to resign.[58]

> **2.      Defendants contend that they are entitled to summary judgment on Plaintiff's state law whistleblower claim.**

Defendants argue that Plaintiff has not proven that his employer committed an actual violation of state law, as required by Louisiana Revised Statute 23:967.[59]  Specifically, Defendants contend that there was no quota system present at the Gretna Police Department, and therefore, there was no actual violation of state law upon which a whistleblower claim can be based.[60]

**B.      *Plaintiff's Arguments in Opposition to Defendants' Motion for Summary Judgment***

> **1.      Plaintiff asserts that genuine issues of material fact preclude summary judgment on his Section 1983 claims.**

With respect to Lawson and Vinson's qualified immunity defenses, Plaintiff acknowledges that "[o]fficials enjoy qualified immunity, in their individual capacity, to the extent that their conduct is objectively reasonable in light of clearly established law.[61]  Plaintiff argues, however, that Lawson and Vinson are not entitled to qualified immunity because the First Amendment right to free speech is a clearly established right and their violation of it was not objectively reasonable.[62]

---

F.2d 748, 755 (5th Cir. 1986)).

[58]  *Id.* at 21.

[59]  *Id.* at 21–22.

[60]  *Id.* at 22.

[61]  Rec. Doc. 35 at 19 (citing *Kinney v. Weaver*, 367 F.3d 337 (5th Cir. 2004) (en banc); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)).

[62]  *Id.* at 19–21 (citing *Warnock v. Pecos Cty., Tex.*, 116 F.3d 776, 781-782 (5th Cir. 1997); *Thompson*, 901

Plaintiff specifically argues that Defendants actions were not objectively reasonable because "speech regarding the existence of an unlawful quota system within the Gretna Police Department was clearly of significant public concern, protected by the guarantees of the First Amendment and a causal connection exists between the plaintiff's speech and the constitutional violation alleged."[63] Moreover, Plaintiff argues, it would have been objectively unreasonable for a public official "with authority to reprimand, demote and terminate, or credibly threaten to terminate, a public employee in retaliation for speech" of the type Plaintiff engaged in.[64]

Regarding the "policy or custom" required to establish municipal liability pursuant to 42 U.S.C. § 1983, Plaintiff argues that the "institutionalized and systemic illegal quota system of the Gretna Police Department has been so longstanding and widespread that is [sic] de facto the very custom, policy, practice and usage having the force and effect of law for the police department."[65] Therefore, Plaintiff contends that "the evidence submitted is replete with material facts, which render summary judgment improper with regard to *Monell* municipal claims."[66]

Plaintiff asserts that summary judgment should be denied as to his First Amendment retaliation claim brought under Section 1983 because genuine issues of material fact exist regarding each element of the claim.[67] Plaintiff notes that there is a four-step test required to establish a retaliation claim: (1) the plaintiff suffered an adverse employment decision; (2) the

---

F.2d at 468–470)).

[63] *Id.* at 20.

[64] *Id.* at 20–21.

[65] *Id.* at 18.

[66] *Id.*

[67] *Id.* at 4–13.

plaintiff's speech involved a matter of public concern; (3) the plaintiff's interest in speaking outweighed the governmental defendant's interest in promoting efficiency; and (4) the protected speech motivated the defendant's conduct."[68] Moreover, Plaintiff notes that the employee must have spoken as a citizen, rather than solely as an employee.[69] Here, Plaintiff contends that he suffered an adverse employment decision when he was constructively discharged from the Gretna Police Department; he spoke on the quota system as a citizen, and his speech involved a matter of public concern; his interest in speaking outweighed any governmental interest in promoting efficiency; and the protected speech motivated Defendant's conduct effectuating the constructive discharge.[70]

In support of Plaintiff's claim that he suffered from adverse employment decisions, Plaintiff points to the following facts, which he contends require a denial of summary judgment: (1) he received a formal disciplinary reprimand from his immediate supervisor Sergeant Danielle Rodriguez for failing to meet the mandated quota of the Gretna Police Department Patrol Division for the month of December 2014;[71] (2) his field training officer position with the Gretna Police Department was terminated on February 2, 2015; at the same meeting where Plaintiff was informed of his termination, Captain Vinson referred to Plaintiff's speech regarding the department-wide quota system as "poison," and Plaintiff was reprimanded by Vinson for attempting to break the chain of command in order to speak with Deputy Chief Christiana directly about the illegal quota

---

[68] *Id.* at 4–5 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138, 142 (1983)).

[69] *Id.* at 5 (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)).

[70] *Id.* at 5–13.

[71] *Id.* at 6 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 193; Rec. Doc. 35-9 (Statement of Facts) at ¶29).

system;[72] (3) in response to Captain Vinson's statements and action, Plaintiff submitted a letter of resignation, giving a two-week notice of separation of employment, which the police department did not honor and instead required Plaintiff to involuntarily use two weeks of accrued vacation time;[73] (4) thereafter, Plaintiff was summoned to a second meeting with Captain Vinson, who gave Plaintiff the opportunity to resign immediately in lieu of termination and investigation for making defamatory statements against the Gretna Police Department in the form of speech against the illegal quota system;[74] and (5) Plaintiff was later contacted by the head of the Gretna Police Department Internal Affair Bureau and directed to remove a license plate from his personal vehicle which displayed Louisiana Revised Statute 40:2401.1.[75]

Next, Plaintiff asserts that his speech "complaining of misconduct within the police department is speech addressing a matter of public concern."[76] According to Plaintiff, his speech pertained to the unlawfulness and illegality of the alleged quota system implemented and enforced by the Gretna Police Department.[77] Plaintiff further asserts, "[E]xposure of official misconduct, especially within the police department, is generally of great consequence to the public."[78] In

---

[72] *Id.* at 6–7 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 54, 98, 99, 101, 105, 135-36; Rec. Doc. 35-9 (Statement of Facts)).

[73] *Id.* at 7 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 54, 98, 99, 101, 105, 135-36; Rec. Doc. 35-9 (Statement of Facts)).

[74] *Id.* (citing Rec. Doc. 35-9 (Statement of Facts) at ¶35).

[75] *Id.* (citing Rec. Doc. 35-9 (Statement of Facts) at ¶38).

[76] *Id.* (citing *Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 463 (5th Cir. 1990); *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1051 (5th Cir. 1992)).

[77] *Id.*

[78] *Id.* at 8–9 (citing *Brawner v. City of Richardson*, 855 F.2d 187, 191–92 (5th Cir. 1988); *Davis v. Ector County*, 40 F.3d 777, 782 (5th Cir. 1995); *Denton v. Morgan*, 136 F.3d 1038, 1043 (5th Cir. 1998)).

addition, Plaintiff argues that his statements were made as a citizen, not merely as an employee.[79] Plaintiff asserts that he spoke out against the alleged quota system of the Gretna Police Department to "anyone who would listen" and had a license plate made which displayed the Louisiana state law prohibiting quotas for law enforcement officers.[80]  According to Plaintiff, he spoke out against the quota system both within his employment and outside his employment, speaking non-exclusively to his immediate supervisors (Sgts. Rodriguez and Heintz), fellow officers, his father, grandmother, the FBI, the harbor patrol, a television investigative reporter, two FBI agents, and the Louisiana Office of the Attorney General.[81]  Therefore, Plaintiff asserts, his statements were not undertaken as an employee but as a citizen.[82]

Plaintiff next argues that the Gretna Police Department's implementation of a quota system was a violation of Louisiana statutory law, and "the effective and efficient operation and functioning of any governmental agency cannot be based upon a violation of law and the rights of the very citizens to whom and for whom they are charged with providing services."[83]  Thus, Plaintiff contends, his interest in speaking outweighs the governmental defendant's interest in promoting efficiency.[84]

Finally, Plaintiff argues, without pointing to specific evidence, that the causation requirement is "easily satisfied for the purpose of defeating summary judgment" by the "direct

---

[79] *Id.*

[80] *Id.* at 9.

[81] *Id.* at 11.

[82] *Id.* at 12.

[83] *Id.* at 12–13.

[84] *Id.* at 12 (citing *Branton*, 272 F.3d 730 (citing *Rankin*, 483 U.S. at 388, and *Pickering*, 391 U.S. at 568)).

evidence and inferences readily drawn from the circumstantial evidence presented in the pleadings."[85]  Moreover, Plaintiff asserts that there is at least an issue of material fact as to whether his failing to comply with the quota system and speaking out against the quota system was a "substantial or motivating factor" of his constructive discharge.[86]

## 2. Plaintiff asserts that genuine issues of material fact preclude summary judgment on his state law whistleblower claim.

Last, Plaintiff claims that genuine issues of material fact exist as to whether Defendants violated Louisiana Revised Statute 23:967, the Louisiana whistleblower statute, by retaliating against him for speaking out against the unlawful quota system implemented by the Gretna Police Department.[87]  Plaintiff argues that he has submitted evidence that a quota system exists within the Gretna Police Department, and that he disclosed the unlawful quota system to law enforcement authorities within and outside his agency and department.[88]  Citing Plaintiff's "Concise Statement of Fact Which Presents Genuine Issues," Plaintiff further argues that his employer engaged in reprisal for Plaintiff's reporting and refusal to participate in the unlawful quota system.[89]  As material issues of fact are in dispute regarding his claim pursuant to the Louisiana whistleblower statute, Plaintiff contends, Defendants' motion for summary judgment on this claim must be denied.[90]

---

[85] *Id.* at 13.

[86] *Id.*

[87] *Id.* at 21.

[88] *Id.* at 22–23.

[89] *Id.* at 23.

[90] *Id.*

## C.      Defendants' Arguments in Further Support of Summary Judgment

In the reply brief, Defendants argue that they cannot be held liable for Plaintiff's perception that there was a violation of state law because "a perceived violation of state law is not a violation of plaintiff's constitutional rights."[91] Moreover, Defendants assert that discovery is complete and no material facts exist as to the claims asserted, such that summary judgment is proper.[92]

Defendants argue that Plaintiff did not address two elements of Plaintiff's First Amendment retaliation/discrimination claim: (1) that the interest in the speech outweighs the government's interest in the efficient provision of public services; and (2) that the speech precipitated the adverse employment action.[93] Additionally, Defendants argue that Plaintiff's conclusion that he was disciplined by Sergeant Rodriguez for failing to meet the alleged quota system has no basis, and that the record evidence establishes that Plaintiff had a history of discipline.[94] Accordingly, Defendants assert, "Plaintiff has not, and cannot, establish that within the less than three-month period serving as the relevant time period in his Complaint, the Gretna Police Department made it so difficult to exercise his free speech rights that he felt compelled to resign."[95]

Defendants also argue that Plaintiff has not shown a policy or custom sufficient to impose municipal liability because the relevant time period is "limited to less than a three-month period

---

[91] Rec. Doc. 40 at 1.

[92] *Id.* at 2. Defendants, however, object to several declarations presented by Plaintiff, which, Defendants assert, contain hearsay within hearsay, prohibited by Federal Rule of Evidence 805.

[93] *Id.* at 5.

[94] *Id.* Defendants also purportedly identify an inconsistency in Plaintiff's evidence regarding who instructed Plaintiff to remove the license plate bearing Louisiana Revised Statute 40:2401.1.

[95] *Id.*

between December 17, 2014 when [Plaintiff] pleads that the 'quota' system was instituted and February 2, 2015 when he resigned."[96] Defendants thereby contend that "[i]t is unreasonable to conclude, and unsupported by the record evidence, that a custom or pattern of unconstitutional activity that is 'so widespread as to have the force of law' and 'occurring for so long or so frequently . . . that the objectionable conduct is the expected, accepted practice of city employees', occurred within a three month period."[97]

Defendants also argue that Plaintiff provides no record evidence to impose municipal liability on the City of Gretna other than three former officers' perceptions and conclusions regarding "irrelevant and unnecessary" allegations outside the scope of Plaintiff's claim that a "quota" was implemented on December 17, 2014.[98] Defendants argue that by statutory definition, a "quota" requires the establishment of a plan to evaluate, promote, compensate, or discipline a law enforcement officer on the basis of a "predetermined or specified number," and Plaintiff has failed to show that any "predetermined or specified number" existed that was "so widespread as to have the force of law," especially since four variations of the quota system are provided by different people.[99] Additionally, Defendants assert that "Plaintiff admits that the [dry erase] board [used by Captain Vinson] was nothing but a motivational prop."[100] Moreover, Defendants argue, a quota system is not a "deprivation of a federal right," even if one did exist.[101] Last, Defendants

---

[96] *Id.* at 6.

[97] *Id.* at 7.

[98] *Id.* at 6.

[99] *Id.* at 6–8.

[100] *Id.* at 8.

[101] *Id.* at 9.

assert, "Plaintiff has failed to adequately establish through record evidence the requisite actual or constructive knowledge on the part of the sole policymaker, Chief Arthur Lawson, or that leadership failed to take corrective action once it learned of the violations."[102] Accordingly, Defendants conclude, no municipal liability exists in this case.

Finally, pursuant to Louisiana Revised Statute 23:967, the Louisiana Whistleblower Act, Defendants assert that Plaintiff must prove that his employer committed an actual violation of state law, which Plaintiff has failed to do insofar as a quota system does not exist.[103]

## D.    *Plaintiff's Arguments in Sur-Reply*

In the sur-reply, Plaintiff asserts that with one exception, Defendants do not identify specific objections to and/or deficiencies in evidence, such that Plaintiff is adequately notified and afforded the opportunity to rebut.[104] Next, Plaintiff argues that Defendant's attempt to limit the relevant time period to a three month window is "not a good faith argument."[105] Plaintiff asserts that evidence beyond that time period "is an absolute necessity in order to satisfy its duty to produce evidence of a pattern, practice, policy, usage or custom as required."[106]

Regarding the dry erase board used by Captain Vinson, Plaintiff asserts, "[t]he declaration

---

[102] *Id*. at 9.

[103] *Id*.

[104] Rec. Doc. 44 at 2. Regarding the one specific objection Defendants raised to the alleged double hearsay in the form of transcripts of audio recording and statements of others in declarations, Plaintiff contends that Defendants failed to recognize the applicable non-hearsay Federal Rule of Evidence 801 and the hearsay exceptions set forth in Rule 802 and 807.

[105] *Id*. at 3.

[106] *Id*. Plaintiff also clarifies the inconsistency regarding who instructed Plaintiff to remove the license plate bearing Louisiana Revised Statute 40:2401. *Id.* Plaintiff explains that the individual who was head of the Gretna Police Department Internal Affairs Bureau at the time the directive was made to remove the license plate is currently the Deputy Chief in Westwego, and presumably that is why two conflicting titles were referred to. *Id.*

of Brouillette unequivocally states that Captain Vinson himself informed her of what the board was and what it meant."[107] Furthermore, Plaintiff avers, he never admitted that the board was a motivational prop.[108]

## E.    *October 11, 2017 Oral Argument*

During oral argument, Defendants asserted that Plaintiff failed to point to any evidence in the record showing that Defendants in any way impeded Plaintiff's ability to speak out against the alleged quota system. With respect to the alleged disciplinary action taken by Vinson against Plaintiff at the February 9 meeting, Defendants explained that any action taken at that meeting cannot have had a disciplinary effect because Plaintiff resigned on February 2, seven days earlier. In addition, Defendants argued that Plaintiff had a history of poor job performance, and to the extent he was disciplined during the course of his employment, it was for that reason alone. Moreover, Defendants argued that Plaintiff relies on speculation and personal understanding to show that he was disciplined because he spoke out against the alleged quota system, but Plaintiff fails to point to any facts in the record raising a material issue of fact precluding summary judgment.

Defendants further argued that Plaintiff's evidence of a quota system is merely colorable, not significantly probative, which falls short of the summary judgment standard. According to Defendants, there is only a three month window between when Plaintiff became aware of the alleged quota system and when his employment terminated, and the quota system cannot have been established in such a widespread manner in that short time period, as would be required to

---

[107] *Id.*

[108] *Id.*

establish municipal liability. Furthermore, Defendants argued that Plaintiff alleges five different quota systems have been implemented by the Gretna Police Department, which defeats the possibility of any one policy or custom existing. Thus, Defendants claim they are entitled to judgment in their favor as a matter of law, as to all claims.

Plaintiff argues that Lawson and Vinson are not entitled to qualified immunity because it is clearly established law that an employer cannot fire an individual for speaking out against illegal activity. Furthermore, Plaintiff argued, a longstanding practice of the Gretna Police Department implementing a quota system can be shown by the record evidence. Plaintiff also abandoned his Fourteenth Amendment claim.

At the close of oral argument, the Court stated that in order to survive a motion for summary judgment, Plaintiff must point to record evidence that shows that there is a disputed issue of material fact. The Court further stated that in order for Defendants to prevail on their motion for summary judgment, they must show that there is no material fact in dispute; and if a factual dispute indeed exists, it is Defendants' burden to show that any such disputed facts are immaterial. The Court permitted both parties to file supplemental memoranda pointing to evidence in the record of disputed material facts, or the absence thereof, by the following week.

F.      ***Plaintiff's Clarification of Facts in the Record Which Create Genuine Issues Regarding the Deprivation of Plaintiff's First Amendment Rights***

In the "Memorandum to Clarify," filed after oral argument, in opposition to the motion for summary judgment, Plaintiff directs the Court to facts in the memorandum in opposition that reference the adverse employment action that was taken against Plaintiff for speaking out against the Gretna Police Department's illegal quota system, which Plaintiff alleges requires a denial of

defendants' motion for summary judgment.[109] Specifically, Plaintiff identifies evidence in the record, principally Plaintiff's deposition testimony, which Plaintiff contends supports the following facts: (1) Plaintiff received a disciplinary reprimand from his immediate supervisor Sergeant Danielle Rodriguez for failing to meet the mandate quota of the Gretna Police Department, which was memorialized in written memorandum;[110] (2) Plaintiff not only spoke against the illegal quota to Sgt. Rodriguez but "to anyone that would listen to him;"[111] (3) Plaintiff affixed a license plate on the front of his vehicle which referenced the Louisiana statute prohibiting quotas;[112] (4) at a meeting on February 2, 2015, Vinson admonished Plaintiff for breaking the chain of command in trying to set up a meeting with the Deputy Chief,[113] referred to Plaintiff's speech against the Gretna Police Department's quota as "poison," and informed Plaintiff that he would be demoted from his position as a Field Training Officer;[114] (5) Captain Vinson advised Plaintiff that he was also going to recommend that he be terminated and persist until Plaintiff was terminated;[115] (6) Plaintiff felt compelled to turn in his letter of resignation at this meeting;[116] (7) termination would have affected his future employment;[117] (8) at a second meeting on February

---

[109] Rec. Doc. 47 at 1–2.

[110] *Id*. at 2 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 178; Rec. Doc. 35-9 (Statement of Facts) at ¶29).

[111] *Id*. (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 47–50, 101, 131–32, 141).

[112] *Id*. (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 49–50, 101, 101–103; Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶18; Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶28; Rec. Doc. 35-5 (Photograph of Swear License Plate)).

[113] *Id*. at 2–3 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 142).

[114] *Id.* at 3 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 98–99, 101, 105).

[115] *Id.* (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 100–01).

[116] *Id*. at 4.

[117] *Id*. at 4–5 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 136; Rec. Doc. 35-1 (Declaration of

23

9, 2015, Vinson threatened to terminate and investigate Plaintiff for making defamatory statements against the Gretna Police Department in the form of speech against the illegal quota system if he did not immediately resign;[118] and (9) at some point during his employment, Plaintiff was instructed by the head of the Gretna Police Department's Internal Affairs Bureau to remove the license plate if he wanted to remain a member of the Gretna Police Department.[119]

Plaintiff further notes that Defendants put forth no evidence that the February 2, 2015, or February 9, 2015 meetings did not occur as described by Plaintiff.[120] Plaintiff similarly points out that Vinson's affidavit does not proffer "any facts to rebut Plaintiff's account of the adverse employment actions."[121] Finally, Plaintiff avers that Defendants admitted that Defendant Lawson had the responsibility for making decisions concerning dismissals, demotions, and discipline, and that authority could be delegated.[122]

## G. *Defendants' Arguments Establishing Lack of Record Evidence to Support Plaintiff's First Amendment Claim*

In Defendants' memorandum filed after oral argument on the motion for summary judgment, with respect to Plaintiff's First Amendment retaliation or discrimination claim, Lawson argues that Plaintiff did not tell him about the alleged quota.[123] Additionally, Defendants argue

---

David Brian Heintz) at ¶6; Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶15).

[118] *Id*. at 5–6 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 53–54).

[119] *Id*. at 6 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 102–03).

[120] *Id*. at 7.

[121] *Id*.

[122] *Id*.

[123] Rec. Doc. 49 at 2 (citing Rec. Doc. 31-2 at 50:13-14).

that there is no record evidence that the Gretna Police Department made any condition so intolerable that a reasonable person in Plaintiff's shoes would be compelled to resign.[124] Defendants also argue that Plaintiff's perception that the January 13, 2015 reprimand by Sergeant Rodriguez was a result of Plaintiff's failure to meet an alleged quota is false; rather, Defendants argue, without citing any evidence, that Plaintiff was reprimanded because Plaintiff did not want to enforce traffic laws during the holidays without permission to suspend his sworn duty.[125]

In addition, Defendants argue that Plaintiff's resignation was effective on February 2, 2015, because Plaintiff only indicated that he was "willing to work two additional weeks," but that the Gretna Police Department had no obligation to accept Plaintiff's offer and did not.[126] Nevertheless, Vinson and Lawson argue, Plaintiff has not pointed to any record evidence that either of them took any steps to stop his speech, and that according to Plaintiff's own deposition testimony, Plaintiff was allowed to freely exercise his right to speech.[127] Defendants argue that Plaintiff's entire claim is based upon speculation, pointing to Plaintiff's deposition testimony in which Plaintiff stated that he did not know whether Captain Vinson or Captain Lloyd agreed that there was a quota system, and he did not know that was their interpretation of the December 14 or 17 meeting.[128]

Furthermore, Defendants argue that Plaintiff's perception of what occurred on February 9, 2015, is unnecessary and irrelevant and cannot possibly constitute a constructive discharge, as it

---

[124] *Id.*

[125] *Id.* at 3–4.

[126] *Id.* at 4.

[127] *Id.* at 5.

[128] *Id.* at 6 (citing Rec. Doc. 31-2 at 105:23-25, 106:1-2).

was seven days after Plaintiff's last day as a full-time member of the police force.[129] Defendants assert that "as a matter of undisputed fact, no 'intolerable conditions' were present between February 2 and 9, 2015, as Plaintiff could not be fired after he resigned."[130] Defendants point to the timeline of events, which Defendants, without citing evidence, assert occurred between December 14, 2014 and February 9, 2015, as further support that the record fails to establish any violation of Plaintiff's First Amendment rights by Lawson, and fails to establish that any policy or custom to violate Plaintiff's constitutional rights was ongoing for so long "as to be widespread and have the force of law."[131]

### III. Legal Standard on a Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[132] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[133] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[134]

---

[129] *Id.*

[130] *Id.*

[131] *Id.* at 6–7.

[132] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[133] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[134] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

If the record, as a whole, "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists, and the moving party is entitled to judgment as a matter of law.[135]

"[A] nonmoving party is not entitled to rest on his pleadings, but must carry his burden of providing evidence of a genuine issue of material fact."[136] "That burden can be met by depositions, answers to interrogatories and admissions on file and affidavits."[137] The Fifth Circuit has "repeatedly held that self-serving affidavits, without more, will not defeat a motion for summary judgment."[138] However, a nonmovant's deposition testimony is often considered by a court in recognizing that a genuine issue of material fact exists, which precludes summary judgment.[139]

The party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[140] Thereafter, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims.[141] To withstand a motion for summary judgment, the nonmoving party must

---

[135] Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

[136] *King v. Chide*, 974 F.2d 653, 656 (5th Cir. 1992) (citing *Reese v. Anderson*, 926 F.2d 494, 499 (5th Cir. 1991)); *see also Celotex*, 477 U.S. at 325; *see also Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[137] *Id.* (citing Fed. R. Civ. P. 56(c)).

[138] *Tyler v. Cedar Hill Indep. Sch. Dist.*, 426 Fed.Appx. 306, 307 (5th Cir. 2011) (per curiam) (citing *DirectTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005); *United State v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001)).

[139] *See, e.g., Vetter v. Frosch*, 599 F.2d 630 (5th Cir. 1979); *see also, e.g., King*, 974 F.2d at 656 (5th Cir. 1992).

[140] *Celotex*, 477 U.S. at 323.

[141] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).

show that there is a genuine issue for trial by presenting evidence of specific facts.[142] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[143] Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[144]

## IV. Law and Analysis

Plaintiff brings claims against Defendants for violation of his First and Fourteenth Amendment rights pursuant to Section 1983. As an initial matter, the Court notes that Plaintiff abandoned his Fourteenth Amendment claim at the October 11, 2017 hearing. Therefore, the Court will dismiss the Fourteenth Amendment claim. Plaintiff also brings claims against Defendants for violating the Louisiana Whistleblower Statute. Defendants move for summary judgment on all of Plaintiff's claims. Accordingly, the Court will address whether Defendants are entitled to summary judgment on each of these claims in turn.

A.    **Whether Defendants are entitled to summary judgment on Plaintiff's Section 1983 claims?**

To bring a claim under 42 U.S.C. § 1983, a plaintiff is required to allege facts

---

[142] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1996)).

[143] *Little*, 37 F.3d at 1075.

[144] Fed. R. Civ. P. 56(c)(2); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987).

demonstrating that: (1) the defendant violated the Constitution or federal law; and (2) that the defendant was acting under the color of state law while doing so.[145] Section 1983 reads, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .[146]

Plaintiff brings claims for violations of his First Amendment rights pursuant to Section 1983 against the City of Gretna and against Vinson and Lawson in their individual and official capacities. In the motion for summary judgment, Defendants contend that Plaintiff's Section 1983 claims should be dismissed because: (1) Lawson and Vinson are entitled to qualified immunity on all claims against them in their individual capacities; (2) no genuine issues of material fact exist precluding summary judgment on Plaintiff's Section 1983 First Amendment Claim against Lawson and Vinson in their individual capacities; (3) Lawson and Vinson are entitled to summary judgment on Plaintiff's Section 1983 claims against them in their official capacity because these claims mirror Plaintiff's claims against the City of Gretna; and (4) the City of Gretna is entitled to summary judgment on Plaintiff's Section 1983 claims against it because Plaintiff has not established that a "policy or custom" caused the alleged constitutional deprivation. Accordingly, the Court addresses each of these issues in turn.

---

[145] *See Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252–53 (5th Cir. 2005).

[146] 42 U.S.C. § 1983.

1.    **Whether Lawson and Vinson are entitled to qualified immunity on the Section 1983 claims brought against them in their individual capacities?**

   a.    *Legal Standard on Qualified Immunity*

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[147] Qualified immunity is an "immunity from suit rather than a mere defense to liability."[148] In this manner, "[o]ne of the most salient benefits of qualified immunity is protection from pretrial discovery, which is costly, time-consuming, and intrusive."[149] Once a defendant invokes the defense of qualified immunity, the plaintiff carries the burden of demonstrating its inapplicability.[150]

In *Saucier v. Katz*, the Supreme Court set forth a two-part framework for analyzing whether a defendant was entitled to qualified immunity.[151] Part one asks the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"[152] Part two inquires whether the allegedly violated right is "clearly established" in that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[153] The Court does not have to address these two questions

---

[147] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[148] *Pearson v. Callahan*, 555 U.S. 223, 237 (2009).

[149] *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

[150] *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).

[151] *Saucier*, 533 U.S. 194 (2001).

[152] *Id.* at 201.

[153] *Id.* at 202.

sequentially; it can proceed with either inquiry first.[154]

Commencing with the second prong of the *Saucier* framework, the Court must determine whether Plaintiff has alleged a violation of a clearly established constitutional right. When deciding whether the right allegedly violated was "clearly established," the Court asks whether the law so clearly and unambiguously prohibited the conduct such that a reasonable official would understand that what he was doing violated the law.[155] "Answering in the affirmative requires the court to be able to point to controlling authority—or a robust consensus of persuasive authority— that defines the contours of the right in question with a high degree of particularity. This requirement establishes a high bar."[156] When there is no controlling authority specifically prohibiting a defendant's conduct, the law is not clearly established for the purposes of defeating qualified immunity.[157]

"If the defendant's actions violated a clearly established constitutional right, the court then asks whether qualified immunity is still appropriate because the defendant's actions were 'objectively reasonable' in light of 'law which was clearly established at the time of the disputed action.'"[158] "Law enforcement officers who reasonably but mistakenly commit a constitutional violation are entitled to immunity."[159] "Whether an official's conduct was objectively reasonable

---

[154] *See Pearson*, 555 U.S. at 236 ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."); *see also Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 469 (5th Cir. 2014).

[155] *May v. Strain*, 55 F.Supp.3d 885, 897 (E.D. La. 2014) (Brown, J.) (citing *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2014)).

[156] *Id.*

[157] *Id.*

[158] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)).

[159] *Williams*, 180 F.3d at 703 (quoting *Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 490 (5th Cir.

is a question of law for the court, not a matter of fact for the jury."[160]

       *b.*     *Analysis*

Lawson and Vinson do not dispute that Plaintiff has alleged a violation of a constitutional right, or that his constitutional right to free speech was clearly established at the time of the alleged violation. Lawson and Vinson argue, rather, that the first prong of Plaintiff's burden to overcome Defendants' assertion of qualified immunity is not met, in that no violation of Plaintiff's constitutional rights took place, and furthermore, that the second prong is not met because Defendants' conduct was not unreasonable in light of clearly established law. Plaintiff generally alleges that Defendants' discipline and constructive discharge of Plaintiff by the Gretna Police Department, in retaliation for Plaintiff's expression of protected speech regarding the alleged illegal quota system, constitutes a violation of his clearly established First Amendment right to free speech. Therefore, Plaintiff argues that neither Lawson nor Vinson is entitled to qualified immunity because Plaintiff had a clearly established right to free speech, which they violated, and their actions were not objectively reasonable.

With respect to Lawson's asserted qualified immunity defense, Plaintiff points to no evidence that Lawson, Chief of the Gretna Police Department, was involved in Plaintiff's constructive discharge of employment. Moreover, Plaintiff does not point to any evidence showing that Lawson failed to train or supervise the officers involved. Therefore, as no evidence in the record suggests that Lawson violated Plaintiff's First Amendment right to engage in protected speech or to be free from retaliation for doing so, Lawson is entitled to qualified immunity with

---

2001)).

    [160] *Brown*, 623 F.3d at 253 (quoting *Collins v. Ainsworth*, 382 F.3d 529, 537 (5th Cir. 2004)).

respect to Plaintiff's First Amendment claim.

However, Plaintiff asserts that Vinson was personally involved in the constructive discharge of Plaintiff from the Gretna Police Department, constituting a violation of his First Amendment Right to be free from retaliation for engaging in protected speech. Vinson does not dispute that Plaintiff had a right to free speech regarding an alleged quota system. However, Vinson asserts, that no quota system existed, Plaintiff resigned voluntarily, and he, in no other way, suppressed Plaintiff's speech. Vinson further argues that his conduct was objectively reasonable in light of the clearly established law. Plaintiff, in turn, points to his own deposition testimony, supported by the declarations of former Gretna police officers David Brian Heintz and Paige Brittany Brouillette, as evidence that he was constructively discharged by Vinson for his speech against the perceived quota system.

Specifically, Plaintiff asserts that he felt compelled to resign after Vinson threatened to pursue his termination at a meeting on February 2, 2015. Plaintiff points to his deposition testimony, in which he states Vinson told Plaintiff that "he had a very serious problem with the quote-un-quote poison that [Plaintiff] was spreading," at the February 2, 2015 meeting.[161] Plaintiff also points to his own deposition testimony as evidence that Vinson threatened to request termination of Plaintiff's employment, and suggested that he would persist in pursuing Plaintiff's termination if initial attempts were unsuccessful.[162] In Plaintiff's deposition he states: "And by me voicing my opinion and my concern for the legality of the issue, that that's when he started speaking about being requesting that I be fired and if he didn't get it this time that he would get it

---

[161] Rec. Doc. 47 at 3 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 100–01).

[162] *Id*. at 4 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 105).

in subsequent requests."[163]

As evidence that termination would adversely affect his ability to secure employment at another police department, Plaintiff points to the declarations of former Gretna police officers David Brian Heintz and Paige Brittany Brouillette, as well as his own deposition testimony.[164] Former officer Heintz states in his declaration that "[f]or an officer, if they were terminated then it would affect their ability to be hired with another police department. Disciplinary actions also affect an officer's ability to be hired with another police department."[165] Former officer Brouillette states in her declaration that "[a] write up is particularly significant because is [sic] becomes a permanent part of your personnel file and can adversely affect internal advancement in rank and be used as evidence in future litigation."[166]

Consequently, Plaintiff asserts, and cites his own deposition testimony in support, that he felt compelled to resign immediately because termination and, or, investigation would adversely affect his future career opportunities, which he wished to avoid.[167] During his deposition, Plaintiff testified that he "felt [he had] no other choice but to submit my letter of resignation prior to the captain's ability to approach the chief or deputy chief with a recommendation of termination."[168]

---

[163] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 105

[164] *Id.* at 4–5 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 123–24, 36; Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 6; Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶ 15).

[165] Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 6.

[166] Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶ 15.

[167] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 123–24, 36.

[168] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 123–24. Plaintiff stated:

This resignation letter was hand delivered to Sergeant Christopher Tapie after the meeting where Captain Vinson, Captain Lloyd, Sergeant Tapie and Sergeant Saladino were present as a result of Captain Vinson harping on the poison that I was spreading that was me voicing my opinion against the illegal quota system. At that point in time, and in addition to that, my inability to have a meeting

In addition, Plaintiff points to his own deposition testimony as evidence that Vinson gave Plaintiff an ultimatum at a February 9, 2015 meeting: that Plaintiff could either resign immediately, or he would be terminated and investigated for making defamatory statements against the Gretna Police Department.[169]

With respect to the circumstances of Plaintiff's termination of employment, Vinson argues that he never interfered with Plaintiff's ability to speak out,[170] and, without pointing to any evidence, argues that Plaintiff's history of discipline was the reason that Plaintiff resigned.[171] Vinson further argues that Plaintiff's resignation was effective on February 2, 2015, and therefore, Plaintiff's perception of what occurred on February 9, 2015, is unnecessary and irrelevant, as it was seven days after Plaintiff's last day as a full-time member of the police force.[172] Vinson asserts that "as a matter of undisputed fact, no 'intolerable conditions' were present between February 2 and 9, 2015 as Plaintiff could not be fired after he resigned."[173]

However, during his deposition, Plaintiff stated that he "was still a member of the Gretna

---

with the deputy chief. At that point in time, I felt no other choice but to submit my letter of resignation prior to the captain's ability to approach the chief or deputy chief with a recommendation of termination.

[169] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 53–54. Plaintiff stated:

On the February 9th meeting, I was called in and during this meeting it was Captain Vinson behind his desk, it occurred in his office, Captain Vinson behind his desk. I sat in the chair to the left and I believe lieutenant was his rank Jim Price sat in the chair to the 15 right of me. It was a closed door meeting. We sat down. It was tense from my perspective. I don't -- all he did was he slid a single piece of paper across the table with a sticky note on it and said I'm giving you the opportunity to resign before we initiate this investigation regarding you making defamatory statements to the Gretna Police Department.

[170] Rec. Doc. 31-1 at 9.

[171] Rec. Doc. 40 at 5.

[172] Rec. Doc. 49 at 6 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 105:23-25, 106:1-2).

[173] *Id.*

Police Department" after he gave his resignation on February 2, 2015, as he had given two-weeks' notice and intended to work those two weeks.[174] Plaintiff explained that he needed to work those two weeks because he "needed [his] reserve commission to make sure [he] could have a gun for the time being until [he] could get a commission somewhere else or file the paperwork to get a concealed weapons permit."[175] According to Plaintiff's deposition testimony, during the February 9, 2015 meeting, Vinson "slid a piece of paper across the table with a sticky note on it and said I'm giving you the opportunity to resign before we initiate this investigation regarding you making defamatory statements to the Gretna Police Department."[176] Therefore, Plaintiff asserts that he was not allowed to work his last two weeks, and instead was forced to resign.

In *Brawner v. City of Richardson*, a case decided by the Fifth Circuit, the plaintiff, a police officer, alleged that he had been discharged for failing to answer questions during an internal investigation, and that his termination constituted retaliation in violation of his First Amendment right to free speech.[177] The defendants in that case contended that they were entitled to qualified immunity because the police officer was discharged for insubordination, not in retaliation for exercising his First Amendment rights.[178] The Fifth Circuit held that whether the plaintiff "was discharged for making the statements or for insubordination is a genuinely disputed issue of material fact," and therefore affirmed the district court's denial of summary judgment.[179]

---

[174] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 54.

[175] *Id.* at 54–55.

[176] *Id.* at 55.

[177] *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 189 (5th Cir. 1988)

[178] *Id.*

[179] *Id.*

Similarly, Vinson's arguments regarding the reason Plaintiff's employment at the Gretna Police Department was terminated and the date of Plaintiff's effective termination merely raise disputed issues of fact, to the extent that Plaintiff has pointed to evidence disputing Vinson's account of the circumstances of Plaintiff's termination and the effective date of termination. These facts are material to whether Plaintiff was threatened with termination and investigation for speaking out against the quota system while still employed, and whether those threats and the consequent risk of adverse impact on future employment constitutes employment circumstances so intolerable any reasonable person would have felt compelled to resign. Vinson's argument that he did not interfere with Plaintiff's ability to speak out does not bear on Plaintiff's argument that he was terminated in retaliation for exercising free speech. Therefore, Vinson does not meet the burden on summary judgment, which allows dismissal of a claim only when there are no material facts in dispute, for this element of qualified immunity.

Moreover, Vinson does not argue that the law is not clearly established that an employer is prohibited from terminating an individual's employment in retaliation for the individual's exercise of protected speech. Furthermore, the Fifth Circuit held in *Cutler v. Stephen F. Austin* that the First Amendment retaliation standard was "clearly established law."[180] In *Click v. Copeland*, the Fifth Circuit rejected a police officer's qualified immunity defense because "a reasonable officer should have known that if he retaliated against an employee for exercising his First Amendment rights, he could not escape liability by engaging in other adverse employment actions," in that case demoting and transferring the employee, "rather than discharging him."[181]

---

[180] *Cutler v. Stephen F. Austin*, 767 F.3d 462 at 471 (5th Cir. 2014).

[181] 970 F.2d 106, 111 (5th Cir. 1992).

In *Brawner*, the Fifth Circuit held in denying qualified immunity to defendant police officers that "it was clearly established that a public employee's speech revealing improper conduct by fellow employees was protected."[182] In effect, the law was clearly established insofar as Vinson should have had a "clear warning that terminating [Plaintiff] on the basis of his speech . . . would violate [Plaintiff's] First Amendment right."[183] Accordingly, the Court finds that Plaintiff had a clearly established right to exercise his First Amendment right to speech free from retaliation.

Finally, Defendants argue that Vinson is entitled to qualified immunity because his conduct was objectively reasonable in light of clearly established law. In response, Plaintiff argues that "speech regarding the existence of an unlawful quota system within the Gretna Police Department was clearly of significant public concern, protected by the guarantees of the First Amendment. Plaintiff further argues that a causal connection exists between the plaintiff's speech and the constitutional violation alleged."[184] Therefore, Plaintiff asserts, it would be objectively unreasonable for a public official with authority to reprimand, demote and terminate or credibly threaten to terminate a public employee in retaliation for speech of the type Plaintiff engaged in.[185]

The Fifth Circuit has routinely held that an objectively reasonable public official would have known that it was unconstitutional to retaliate against an employee for engaging in protected speech.[186] In *Brawner*, the Fifth Circuit, in denying qualified immunity to defendant police

---

[182] *Brawner*, 855 F.2d at 193.

[183] *Cutler*, 767 F.3d at 473.

[184] Rec. Doc. 35 at 20.

[185] *Id*. at 20–21.

[186] *See, e.g., Thompson*, 901 F.2d at 468-470 (holding that it was unreasonable for police officials to terminate a police officer for filing written grievances related to the department's promotion policy and for making oral complaints about police misbehavior); *see also, e.g, Harris v. Victoria Indep. Sch. Dist*., 336 F.3d 343, 344 (5th Cir. 1999) (holding that a reasonable school official would know it is unconstitutional to retaliate against teachers when

officers, held that "a reasonably objective public official would have known that termination of an employee for his speech concerning misconduct by public officials would violate a clearly established constitutional right."[187] As Vinson does not specify how constructively discharging Plaintiff in retaliation for his exercise of free speech would have been objectively reasonable in light of clearly established law, the Court finds that Vinson's conduct in constructively discharging Plaintiff, if such conduct did occur, was not reasonable as a matter of law.

In sum, whether Vinson constructively discharged Plaintiff in retaliation for Plaintiff's exercise of his free speech, prior to Plaintiff's effective termination of employment is an issue of material fact. A reasonable trier of fact could find that Vinson's conduct violated Plaintiff's clearly established constitutional right to free speech. Moreover, Plaintiff "must ultimately prove that his speech was the motivating factor in his [constructive] discharge."[188] Therefore, "the determination of [these] issue[s] turn on a genuine dispute of material fact, and [are] proper issue[s] for trial, not for resolution by summary judgment."[189]

2. **Whether a genuine issue of material fact exists precluding summary judgment on Plaintiff's Section 1983 First Amendment claim against Vinson in his personal capacity?**

---

they engage in protected speech.); *see also, Frazier v. King*, 873 F.2d 820, 827 (5th Cir. 1989) (holding that it was objectively unreasonable for the warden of a state correctional center to fire a registered nurse in violation of her clearly established right to report violations of nursing practices in the infirmary).

[187] *Brawner*, 855 F.2d at 193

[188] *Id.*

[189] *Id.* The Fifth Circuit has stated that in "view[ing] the facts in [an] interlocutory appeal from the district court's decision denying qualified immunity . . . we are required to accept the truth of the plaintiffs' summary judgment evidence, and we lack jurisdiction to review the genuineness of those factual disputes that precluded summary judgment in the district court." *Kinney v. Weaver*, 367 F.3d 337, 341 (5th Cir. 2004).

### a. Legal Standard

To succeed in a First Amendment retaliation claim pursuant to 42 U.S.C. § 1983, a public employee must show: "(1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action."[190]

Employer actions that can result in liability include more than just actual or constructive discharge from employment.[191] "Adverse employment actions can include discharges, demotions, refusals to hire, refusals to promote, and reprimands."[192] An employer's activities may be deemed to amount to a constructive discharge only if "the employer made conditions so intolerable that the employee reasonably felt compelled to resign."[193] "[A] constructive discharge claim requires a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment."[194]

### b. Analysis

Plaintiff claims that his First Amendment right to free speech was violated by Vinson when he constructively discharged Plaintiff from employment at the Gretna Police Department for

---

[190] *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007).

[191] *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999).

[192] *Id.*

[193] *Shawgo v. Spradlin*, 701 F.2d 470, 481 (5th Cir. 1983); *Kelleher v. Flawn*, 761 F.2d 1079, 1086 (5th Cir. 1985).

[194] *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) (internal citation and quotation marks omitted).

speaking out against the quota system. Vinson does not dispute that Plaintiff had a right to free speech regarding an alleged quota system, but asserts that no quota system existed, that Plaintiff resigned voluntarily, and that Plaintiff's speech was in no other way suppressed. Plaintiff, in turn, points to his own deposition testimony, supported by the declarations of former Gretna police officers David Brian Heintz and Paige Brittany Brouillette, as evidence that he was constructively discharged by Vinson for his speech against the perceived quota system.

Plaintiff's claim against Vinson in his personal capacity is "simply required to allege that [Vinson] caused a rights deprivation while acting under the color of state law."[195] At the time of Plaintiff's alleged constructive discharge, Vinson was the Captain of the Patrol Division of the Gretna Police Department. Vinson does not dispute that he held this title at all relevant times. Therefore, the Court finds that Vinson was acting under the color of law, in his employment by the Gretna Police Department, when the alleged constructive discharge took place.

As noted above, a public employee must establish four elements to succeed in a First Amendment retaliation claim pursuant to Section 1983.[196] Therefore, the Court addresses each of these elements in turn.

     *i.*   *Whether Plaintiff suffered an adverse employment action?*

Regarding the first element of a First Amendment retaliation claim, the Fifth Circuit has recognized that "[a]dverse employment actions can include discharges, demotions . . . and

---

[195] 473 U.S. at 166; *see St. Martin v. Jones*, No. 08-1047, 2008 WL 4412267, at *6 (E.D. La. Sept. 17, 2008) (applying *Kentucky v. Graham* in distinguishing claims brought against a sheriff in his official and personal capacity).

[196] *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007).

reprimands."[197] To prove a constructive discharge, a plaintiff must show that a "reasonable person in [his] shoes felt compelled to resign."[198] "[A] constructive discharge claim requires a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment."[199] In *Benningfield v. City of Houston*, the Fifth Circuit held that the plaintiff's fear of future retaliation was not sufficient to support her claim of constructive discharge.[200]

In the instant case, Plaintiff points to his own deposition testimony as evidence that he was demoted and reprimanded for speaking out against the quota system. Plaintiff further avers that on February 2, 2015, he was called to a meeting with Vinson, who informed Plaintiff that his field training officer position with the Gretna Police Department was terminated effective immediately.[201] Plaintiff states in his deposition, "[Vinson] then went on to discuss that he was going to take my FTO, my FTO status away from me because I was spreading poison of an illegal quota system and that he couldn't risk having that spread to new people coming in. And that he was going to write me up for insubordination and breaking the chain of commend [sic] in order to try and have a meeting with Deputy Chief Christiana."[202] Whether or not the demotions and reprimands were issued because of Plaintiff's speech about the quotas, and whether those actions were of a "greater severity or pervasiveness of harassment" than that of a hostile work environment

---

[197] *Sharp*, 164 F.3d at 933.

[198] *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998) (internal citation and quotation marks omitted).

[199] *Id.*

[200] *Id.*

[201] Rec. Doc. 47 at 3 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 54, 98, 99, 101, 105, 135–36).

[202] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 98.

is a question of material fact.[203]

For a resignation to constitute constructive discharge, an employer's actions must make conditions so intolerable that the reasonable employee would feel compelled to resign.[204] Plaintiff asserts that he felt compelled to resign after Vinson threatened to pursue his termination at a meeting on February 2, 2015. In support, Plaintiff points to his deposition testimony that Vinson told Plaintiff that "he had a very serious problem with the quote-unquote poison that [Plaintiff] was spreading," at the February 2, 2015 meeting.[205] Plaintiff also points to his own deposition testimony as evidence that Vinson threatened to request termination of Plaintiff's employment, and suggested that he would persist in pursuing Plaintiff's termination if initial attempts were unsuccessful.[206] In Plaintiff's deposition he states: "And by me voicing my opinion and my concern for the legality of the issue, that that's when he started speaking about being requesting that I be fired and if he didn't get it this time that he would get it in subsequent requests."[207]

As evidence that termination would adversely affect his ability to secure employment at another police department, Plaintiff points to the declarations of former Gretna police officers David Brian Heintz and Paige Brittany Brouillette, as well as his own deposition testimony.[208] Former officer Heintz states in his declaration that "[f]or an officer, if they were terminated then

---

[203] *Id.*

[204] *Shawgo v. Spradlin*, 701 F.2d 470, 481 (5th Cir. 1983); *Kelleher v. Flawn*, 761 F.2d 1079, 1086 (5th Cir. 1985).

[205] Rec. Doc. 47 at 3 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 100–01).

[206] *Id.* at 4 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 105).

[207] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 105

[208] *Id.* at 4–5 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 123–24, 36; Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 6; Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶ 15).

it would affect their ability to be hired with another police department. Disciplinary actions also affect an officer's ability to be hired with another police department."[209] Former officer Brouillette states in her declaration that "[a] write up is particularly significant because is [sic] becomes a permanent part of your personnel file and can adversely affect internal advancement in rank and be used as evidence in future litigation."[210]

Consequently, Plaintiff asserts, and cites his own deposition testimony in support, that he felt compelled to resign immediately because termination and, or, investigation would adversely affect his future career opportunities, which he wished to avoid.[211] During his deposition, Plaintiff testified that he "felt [he had] no other choice but to submit my letter of resignation prior to the captain's ability to approach the chief or deputy chief with a recommendation of termination."[212] In addition, Plaintiff points to his own deposition testimony as evidence that Vinson gave Plaintiff an ultimatum at a February 9, 2015 meeting: that Plaintiff could either resign immediately, or he would be terminated and investigated for making defamatory statements against the Gretna Police Department.[213]

Whether interference with future employment opportunities constitutes conditions so intolerable that a reasonable employee would feel compelled to resign requires a factual determination.[214] Defendants argue that Plaintiff's employment terminated due to poor job

---

[209] Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 6.

[210] Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶ 15.

[211] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 123–24, 36.

[212] *Id.* at 123–24.

[213] *Id.* at 53–54.

[214] *Kelleher*, 761 F.2d at 1086 ("It is unclear whether the question is one of fact or a mixed question of fact

performance, rather than in retaliation for his exercise of free speech. However, the evidence of discipline and constructive termination which Plaintiff puts forth raises a disputed issue of material fact as to the cause of the termination of his employment, such that a reasonable trier of fact could find that Plaintiff was constructively discharged and thereby subjected to an adverse termination action.

      *ii.       Whether Plaintiff spoke as a citizen on a matter of public concern?*

Regarding the second element, "[t]he courts will not interfere with personnel decisions when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest."[215] Matters of public concern are those which can "be fairly considered as relating to any matter of political, social, or other concern to the community."[216] Specifically, speech "complaining of misconduct within the police department is speech addressing a matter of public concern."[217]

Plaintiff claims that he spoke as a citizen on a matter of public concern in speaking out against the quota system. According to Plaintiff's deposition testimony, his speech pertained to the unlawfulness and illegality of the alleged quota system implemented and enforced by the Gretna Police Department.[218] In addition, Plaintiff points to evidence that his license plate displayed Louisiana Revised Statute 40:2401.1, a state statute pertaining to all peoples of

---

and law.").

    [215] *Wallace*, 80 F.3d at 1050.

    [216] *Branton*, 272 F.3d at 730.

    [217] *Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 463 (5th Cir. 1990); *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1051 (5th Cir. 1992)). *Brawner*, 855 F.2d at 192.

    [218] Rec. Doc. 35-9 at ¶ 24 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 104; Rec. Doc. 35-4 (Declaration of Daniel Swear)).

Louisiana.[219] Former Gretna police officer Brouillette also stated in her declaration, "I saw the license plate, that had the Louisiana Revised Statute regarding the illegality of quotas for law enforcement officers, on Daniel Swear's personal vehicle while he was still working at the Gretna Police Department.[220] Plaintiff stated in his deposition, "I went as far as I had a license, an assembly line license plate made on my personal car with the statute that prohibited quotas in Louisiana."[221] Defendants do not argue that the type of speech Plaintiff engaged in is not of public concern. Thus, Plaintiff has put forth sufficient evidence to permit a reasonable trier of fact to find that Plaintiff spoke on a matter of public concern when he spoke out against the alleged quota system implemented by the Gretna Police Department.

Regarding whether Plaintiff spoke "primarily in his role as citizen or primarily in his role as employee,"[222] Plaintiff points to evidence that he spoke "widely and persistently to anyone who would listen" regarding the alleged quota policy of the Gretna Police Department.[223] Plaintiff stated in his deposition, "I mean I was so openly troubled by that that I told anyone and everyone that I could."[224] Plaintiff also states in his deposition that he displayed a license place on which Louisiana Revised Statute 40:2401.1 was printed, which was viewable by the public wherever his car was driving or situated.[225] Moreover, Plaintiff points to evidence that he spoke out against the

---

[219] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 50, 101–02; 135; Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶ 18.

[220] Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶ 18.

[221] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 50.

[222] *Wallace*, 80 F.3d at 1050.

[223] Rec. Doc. 35 at 9 (citing Rec. Doc. 35-9 at ¶¶ 24–28).

[224] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 50.

[225] *Id.*

alleged quota system of the Gretna Police Department both within his employment and outside of his employment. Specifically, during his deposition, Plaintiff testified that he spoke non-exclusively to his immediate supervisors, Sergeants Rodriguez and Heintz, fellow officers, his father, grandmother, the FBI, the harbor patrol, a television investigative reporter, two FBI agents, and the Louisiana Office of the Attorney General.[226] Defendants do not argue that Plaintiff was not speaking as a citizen when he spoke out against the quota system. Accordingly, Plaintiff has put forth sufficient evidence to permit a reasonable trier of fact to find that Plaintiff spoke as a citizen regarding a matter of public concern, when he spoke out against the quota system to individuals well beyond the scope of his employment.

      *iii.*     *Whether Plaintiff's interest in the speech outweighs the government's interest in the efficient provision of public services?*

Regarding the third element, the Fifth Circuit has held that it must "balance the employee's interest, as a citizen, in commenting upon matters of public concern against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"[227] This inquiry "involves whether the speech: (1) was likely to generate controversy and disruption, (2) impeded the department's general performance and operation, and (3) affected working relationships necessary to the department's proper functioning."[228] In *Brawner*, the defendants argued that the police department's interest in conducting thorough investigations outweighed the Plaintiff's interest in expressing dissatisfaction with his treatment during such an

---

[226] *Id.* at 11 (citing Rec. Doc. 31-2 at 44–47).

[227] *Branton*, 272 F.3d at 739 (quoting *Rankin*, 483 U.S. at 388; *Pickering*, 391 U.S. at 568).

[228] *Brawner*, 855 F.2d at 192.

investigation.[229] The Fifth Circuit rejected this argument, holding that "if the allegations of internal misconduct are indeed true, [the plaintiff's] statements could not have adversely affected the proper functioning of the department since the statements were made for the very reason that the department was not functioning properly due to corruption.[230]

Similarly, Plaintiff argues that implementing a quota system was a violation of Louisiana statutory law, and "the effective and efficient operation and functioning of any governmental agency cannot be based upon a violation of law and the rights of the very citizens to whom and for whom they are charged with providing services."[231] Defendant does not put forth any argument that Plaintiff's interest in commenting on the quota system, if found to be a matter of public concern, is outweighed by the government's interest in the efficient provision of public services. Given that Plaintiff has a legitimate interest in commenting upon the quota system, and no government interest in promoting efficiency or functionality has been identified that would suffer from Plaintiff's speech, the balancing of interests weighs in favor of Plaintiff's free speech.

> iv.     *Whether the speech precipitated the adverse employment action?*

Regarding the fourth and final element, Plaintiff asserts that his speech regarding the quota system precipitated the adverse employment actions of discipline and constructive termination. In support, Plaintiff provides evidence that Vinson told Plaintiff that "he had a very serious problem with the quote-unquote poison that [Plaintiff] was spreading," at the February 2, 2015 meeting, at

---

[229] *Id.*

[230] *Id.*

[231] Rec. Doc. 35 at 12–13.

which he was demoted.[232] Plaintiff also provides evidence that at the same meeting, Vinson threatened to request termination of Plaintiff's employment, and suggested that he would persist in pursuing Plaintiff's termination if initial attempts were unsuccessful.[233] According to Plaintiff's deposition testimony, "[t]here was a heavy emphasis on [Plaintiff] spreading poison of this quota system. That was the focus of [the meeting]."[234] Plaintiff also stated in his deposition, "voicing my opinion and my concern for the legality of the issue, that that's when [Vinson] started speaking about [] requesting that I be fired and if he didn't get it this time that he would get it in subsequent requests."[235] Last, Plaintiff asserts that Vinson told Plaintiff at a February 9, 2015 meeting that Plaintiff could either resign immediately, or he would be terminated and investigated for making defamatory statements against the Gretna Police Department.[236]

Vinson argues that termination of Plaintiff's employment was not precipitated by any adverse employment action, but that Plaintiff voluntarily resigned and had a history of discipline. However, given the evidence Plaintiff has put forth of incidents of reprimand or threatened termination that occurred while or soon after Plaintiff was criticized by Gretna Police Department personnel for his speech about the quotas, a reasonable trier of fact could find that Plaintiff's speech regarding the quotas precipitated the adverse employment actions of discipline and constructive termination.

Thus, Plaintiff has put forth evidence that raises unresolved issues of material fact with

---

[232] Rec. Doc. 47 at 3 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 100–01).

[233] *Id.* at 4.

[234] *Id.* at 3–4 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 105).

[235] *Id.* at 4–5 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 105).

[236] *Id.* at 5–6 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 53–54).

respect to all four elements required to satisfy a Section 1983 First Amendment retaliation claim. Accordingly, Plaintiff's First Amendment claim against Vinson in his personal capacity may not be dismissed upon Defendants' summary judgment motion, as there is no dispute that Vinson's actions were taken under color of the law, and there exists issues of material fact as to whether Vinson violated Plaintiff's constitutional rights.

**3.      Whether Lawson and Vinson are entitled to summary judgment on Plaintiff's Section 1983 claims against them in their official capacities?**

*a.      Legal Standard*

In *Kentucky v. Graham*, the Supreme Court held that an official capacity suit is "only another way of pleading an action against an entity of which an officer is an agent" and is to be treated as a suit against the entity.[237]   The Fifth Circuit has enforced an identical rule and barred claims brought in a single action against official capacity individuals and against the entity of which they are members.   In *Sims v. Jefferson Downs Racing Association, Inc.*, the Fifth Circuit held that, due to the nature of official capacity suits, a judgment against a corporation and its officer would "effectively make the corporation liable twice for the same act."[238]   Moreover, a judgment against an individual acting in an official capacity and against the entity that employs him on the same claim is equivalent to a judgment against the entity twice over, and is therefore barred by virtue of subjecting a defendant-entity to "duplicative" or "redundant" liability.[239]   However,

---

[237]  473 U.S. 159, 165 (1985).

[238]  778 F.2d 1068, 1081 (5th Cir. 1985).

[239]  *See Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 262 (5th Cir. 1999); *see also Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001).

separate claims brought against an official and his entity in the same action are permitted and governed by the general rules of pleading.[240]

   b.    *Analysis*

To the extent Plaintiff asserts Section 1983 claims against Defendants Vinson and Lawson in their official capacities, those claims appear to mirror the Section 1983 claim against the City of Gretna—that Plaintiff's constitutional right to free speech was violated by the Gretna Police Department's discipline and constructive discharge of Plaintiff for speaking out against the quota system, pursuant to the Department's policy of implementing a quota system. As previously stated, the Fifth Circuit has held that such actions are barred by virtue of subjecting a defendant-entity to "duplicative" or "redundant" liability.[241] Accordingly, Plaintiff was required to clarify in his pleadings if he is in fact asserting different claims against Vinson and Lawson in their official capacities and the City of Gretna, otherwise, the Court must dismiss one of the duplicative claims or sets of claims. As Plaintiff has not clarified any difference in claims, the Court will dismiss the Section 1983 claims against Defendants Vinson and Lawson in their official capacities, and proceed with analysis of Plaintiff's Section 1983 First Amendment claim against the City of Gretna.

   **4.    Whether the City of Gretna is entitled to summary judgment on Plaintiff's Section 1983 claims against it?**

   a.    *Legal Standard*

---

[240] *Id.*

[241] *Indest*, 164 F.3d at 262; *Romero*, 256 F.3d at 355.

With respect to a Section 1983 claim against an entity, the Supreme Court held in *Monell v. Department of Social Services of City of New York*, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury [] the government as an entity is responsible under § 1983."[242] Moreover, "[a] § 1983 plaintiff [] may be able to recover from a municipality without adducing evidence of an affirmative decision by policymakers if able to prove that the challenged action was pursuant to a state 'custom or usage.'"[243] In order to establish a Section 1983 claim against a municipality, the official policy must be the cause and moving force of the constitutional violation.[244] Finally, the "policymaker must have either actual or constructive knowledge of the alleged policy."[245]

      *b.    Analysis*

Plaintiff argues that Defendant City of Gretna violated a constitutional law by having a policy of implementing a quota system, which was the moving force in the retaliatory termination of Plaintiff from the Gretna Police Department for exercising his First Amendment right to free speech against the quota system.

Plaintiff's Section 1983 First Amendment retaliation claim against the City of Gretna relies on the same facts asserted in support of Plaintiff's Section 1983 First Amendment retaliation claim against Vinson in his personal capacity, with the addition of facts involving the conduct of other

---

[242] 436 U.S. 658, 694 (1978).

[243] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 (1986).

[244] *Monell*, 436 U.S. at 694.

[245] *Cox v. City of Dallas*, 430 F.3d 734, 748–49 (5th Cir. 2005) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

Gretna Police Department employees. Specifically, in addition, Plaintiff points to evidence that he received a formal disciplinary reprimand from his immediate supervisor Sergeant Danielle Rodriguez for failing to meet the mandated quota of the Gretna Police Department Patrol Division for the month of December 2014;[246] and Plaintiff was contacted by the head of the Gretna Police Department Internal Affair Bureau and directed to remove a license plate from his personal vehicle which displayed Louisiana Revised Statute 40:2401.1.[247] As evidence of the former, Plaintiff points to Exhibit B of his deposition, which is the memorandum from Sgt. Danielle Rodriguez to Vinson memorializing the oral reprimand.[248] As evidence of the latter, Plaintiff stated in his deposition, that on a phone call with Lieutenant DeMarco, "he advised me that someone above the rank of captain told him to inform me that if I don't remove the license plate from my personal -- if I wanted to remain a member of the Gretna Police Department that I needed to remove that license plate from the front of my personal car."[249]

The Court has already determined that Plaintiff has identified issues of material fact with respect to the Section 1983 First Amendment retaliation claim against Vinson in his personal capacity, such that Defendants' motion for summary judgment cannot be granted with respect to Plaintiff's claim against Vinson. These issues of material fact equally apply to Plaintiff's claim against the City of Gretna, which involves the conduct of Vinson, among others. Moreover, the evidence of alleged facts stated above relevant to Plaintiff's claim against the City of Gretna, only

---

[246] Rec. Doc. 47 at 2 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 178; Rec. Doc. 35-9 (Statement of Facts) at ¶ 29).

[247] *Id.* at 6–7.

[248] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 193.

[249] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 102.

bolster issues of material fact as to the cause of Plaintiff's termination of employment already found to exist. Thus, Plaintiff has sufficiently identified issues of material fact with respect to the Section 1983 First Amendment retaliation claim against the City of Gretna not appropriate for determination at the summary judgment stage.

Still, when a Section 1983 claim is brought against a municipality, Plaintiff must demonstrate that the "challenged action was pursuant to a state 'custom or usage.'" [250] Furthermore, in order to establish a Section 1983 claim against a municipality, the official policy must be the cause and moving force of the constitutional violation,[251] and the policymaker must have either actual or constructive knowledge of the alleged policy.[252]

Plaintiff asserts that the Gretna Police Department implemented a policy requiring officers to comply with a quota system of performance. Plaintiff puts forth evidence that a required quota of "10-2-2" was utilized within the Gretna Police Department since at least 2007 and required patrol officers to have at least 10 items, 2 citations, and 2 arrests per shift, which had to equal the required total by the end of the month.[253] In his deposition, Plaintiff stated, "The first time that I was aware of a quota policy was when we were given the term 10-2-2 while working patrol. And that corresponded to the goal of ten items per might, two arrests per night and two citations per

---

[250] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 (1986).

[251] 436 U.S. 658, 694 (1978).

[252] *Cox v. City of Dallas*, 430 F.3d 734, 748–49 (5th Cir. 2005) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

[253] Rec. Doc. 35-9 at 1 (citing Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 17; Rec. Doc. 31-2 (Deposition of Daniel Swear) at 17; Rec. Doc. 35-4 (Declaration of Daniel Wayde Swear) at 40); Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶ 8).

night."[254] Former Gretna police officer Heintz stated in his declaration that police officers "were required to meet a standard quota of 10-2-2."[255] Heintz explained that "[t]he 10-2-2 quota meant, that patrol officers were required to have 10 items, 2 citations and 2 arrests per shift, which had to equal to the required total by the end of the month."[256] Former Gretna police officer Brouillette also stated in her declaration, "I was personally made aware that 10 attachments, 2 citations and 2 arrests were the minimum requirements for every shift."[257]

As further evidence that a quota system existed, Plaintiff points to former officer Heintz's declaration indicating that he was written up twice in 2007 for failing to meet the required quota at that time of two citations per shift.[258] In addition, Plaintiff points to evidence that a shift supervisor was required to keep statistics of subordinate officers which would be given to Captain Scott Vinson.[259] Specifically, former officer Heintz stated the following in his declaration: "As a shift supervisor was [sic] required to keep statics [sic] of subordinate officers. I would give the statics [sic] to Lieutenant Scott Vinson. Curtis Snow would compile the statistics at the end of the

---

[254] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 17.

[255] Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 17.

[256] *Id.*

[257] Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶ 8.

[258] Rec. Doc. 35-9 at 1 (citing Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 11-13). Former officer Heintz made the following statements in his declaration:

In 2007, I went to the day shift in which Jarvis Jackson was Lieutenant. At that time, I was required to have 2 citations per shifts [sic]. I was written up in October of 2007 for "unsatisfactory performance" for failing to meet the required 2 citations per shift. I was again written up in November of 2007 for "unsatisfactory performance" for failing to meet the required 2 citations per shift. I took the write up to Marty Schmidt with Internal Affairs Division. I was advised by Mr. Schmidt that the write up would not go into my personnel file.

[259] Rec. Doc. 35-9 at 2 (citing Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶19; Rec. Doc. 35-2 (Declaration of Paul Pichoff) at 9–11).

month."[260]

Furthermore, Plaintiff points to evidence that if the required quota was not met, an officer could be written up, suspended, and/or ultimately terminated; and if supervising officers did not enforce the Gretna Police Department's policy, practice, and custom of institutionalized quotas, they would also be subject to discipline.[261] Former officer Heintz stated in his declaration, "Scott Vinson told me that we as supervisors would be held accountable if the numbers slipped. To my knowledge after that meeting, more officers began to get written up for failing to meet the 10-2-2 quotas."[262] Former officer Brouillette stated in her declaration, "I was advised by my immediate supervisor, Daniel [sic] Rodriguez, that if I did not pick my numbers up I would be written up. If I was written up I could be also suspended and ultimately fired."[263] In his own deposition testimony, Plaintiff stated, "[Vinson] advised the supervisors in the presence of the officers that worked for them that if the supervisors did not enforce this [mandatory quota policy] that he would take action against them."[264] When asked whether Vinson described what action he would take against the supervisors, Plaintiff responded, "Not against the supervisors. Just the action against the officers which would be being written up and/or suspended and ultimately terminated."[265] Plaintiff also points to an audio transcript between former Gretna police officer Paul Pichoff and

---

[260] Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 19.

[261] Rec. Doc. 35-9 at 2 (citing Rec. Doc. 35-2 (Declaration of Paul Pichoff); Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶ 7; Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 26; Rec. Doc. 31-2 (Deposition of Daniel Swear) at 20-21, 34; Rec. Doc. 35-4 (Declaration of Daniel Wayde Swear) at 4, 5, 49).

[262] Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 26.

[263] Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶ 7.

[264] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 34.

[265] *Id.*

his supervisors, Sergeant Philip Saladino and Lieutenant J.R. Rogers, memorializing Pichoff's performance evaluation which took place on January 7, 2014, in which Pichoff and his supervisors discuss Pichoff's failure to make enough arrests or citations and Lieutenant Rogers threatens to terminate Pichoff if his performance did not improve.[266]

Finally, Plaintiff points to evidence that a quota existed in 2014 requiring issuance of three citations a day and an average of one arrest every two days.[267] According to Plaintiff's deposition testimony, Sergeant Rodriguez would hand out highlighted statistics during roll call on a weekly basis, which showed how many citations and arrests an officer had made to show officers in what sections they were lacking and needed to improve before the end of the month.[268] As previously discussed, Plaintiff also points to his deposition testimony as evidence that he was orally reprimanded by Sergeant Rodriguez for failing to meet the mandated quota for the month of December 2014.[269] Specifically, Plaintiff points to Exhibit B of his deposition, which is the memorandum from Sgt. Danielle Rodriguez to Vinson memorializing the oral reprimand.[270] Plaintiff further points to evidence that following the December 17 and/or 19, 2014 meeting with Captain Vinson, former officer Brouillette was also written up for failing to meet Gretna Police Department's policy, practice, and custom of institutionalized quotas.[271]

---

[266] Rec. Doc. 35-2 (Declaration of Paul Pichoff).

[267] Rec. Doc. 35-9 at 4 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 21, 28-29, 111-112; Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶¶ 7, 11; Rec. Doc. 35-4 (Declaration of Daniel Swear) at 4, 5, 49).

[268] *Id*. at 5 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 29–30).

[269] *Id*. at 6 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 193).

[270] Rec. Doc. 31-2 (Deposition of Daniel Swear) at 193.

[271] Rec. Doc. 35-9 at 8 (citing Rec. Doc. 35-3, Declaration of Paige Brittany Brouillette at ¶14 and Exhibit 1). In her declaration, former officer Brouillette states the following and attached an image of the write-up as Exhibit 1:

Finally, Plaintiff points to the declarations of former officer Brouillette and former officer Heintz as evidence that Vinson had a dry erase board in his office which listed the names of the patrol division and tracked their compliance with the mandatory quota policy.[272]

Defendants argue that Plaintiff only puts forth evidence of police officers' understanding that a quota system existed, rather than any actual evidence that a quota system existed. However, a police officer's understanding that a quota system existed, though perhaps not dispositive, is "highly relevant to the existence of a custom" within the Gretna Police Department of implementing a quota system.[273] Defendants additionally argue that Plaintiff points to three variations of a quota system, and therefore, an established mandatory quota policy or custom cannot have existed. However, Defendants' argument misses the mark. Plaintiff need only put forth evidence that the Gretna Police Department had an established policy or custom of

> I was in fact written up on January 13, 2015, for unsatisfactory performance for not meeting the quota . . . I was advised that if I continued to not meet the designated numbers, I would have my position as crime scene tech taken away and I would be moved to day shift which they knew would adversely affect my pay and my home life because my husband worked for EMS day shift and I worked night shift which allowed one of us to always be home with our children.

[272] Rec. Doc. 35-9 at 8 (citing Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶20; Rec. Doc. 35-2 (Declaration of Paul Pichoff); Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 33, Exs. 1, 2). Former officer Brouillette states the following in her declaration:

> Captain Scott Vinson had a dry erase board in his office which list the names of the patrol division officers like the image attached hereto as Exhibit 2. Captain Scott Vinson explained to me that the symbols on the dry erase board corresponding to the officers name also on the board was a rating system to identify officers not meeting the mandatory quota policy of the Gretna Police Department. Red symbols signified non-compliance by the officer with the quota criteria. Green symbols signified compliance with the quota policy.

Former officer Heintz states the following his declaration:

> This dry erase board was used by Scott Vinson to keep track of the officer stats. It was apparent that the red checks on the dry erase board meant that officer failed to meet the quota requirement. If the officer did meet the quota requirement there would be a green star or check next to the officer's name.

[273] *See Bishop v. Arcuri*, 674 F.3d 456, 468 (5th Cir. 2012) (holding that "the [employee's] understanding of common operating procedure is highly relevant to the existence of a custom.")

implementing quota systems pursuant to which the challenged activity took place. In other words, Plaintiff is entitled to argue that the challenged activity—that Plaintiff was constructively discharged by the Gretna Police Department for exercising his First Amendment right to free speech—was pursuant to the Department's policy of implementing quotas, in that because of that policy, Plaintiff was required to comply with one of any unlawful quota systems and was constructively discharged for speaking out against it. Moreover, a quota system in any form would have been in violation of state law and cause for Plaintiff to speak out, triggering retaliation. Thus, Plaintiff has at least raised a question of material fact as to whether a policy or custom of implementing quota systems by the Gretna Police Department exists.

As previously stated, in order for Plaintiff to establish a Section 1983 claim against the City of Gretna, the custom or policy of implementing a quota system must be the cause and moving force of the constitutional violation.[274] Plaintiff argues that the City of Gretna violated his First Amendment right to free speech by disciplining and constructively discharging him in retaliation for speaking out against the quota system's violation of Louisiana state law, and that the policy of implementing a quota system was the moving force of that constitutional violation. In response, Defendants assert that no quota system existed, Plaintiff resigned voluntarily, and Plaintiff's speech was in no other way suppressed.

The Court has already stated that a reasonable trier of fact could find that Plaintiff's speech regarding the quota system precipitated the alleged adverse employment actions. In support of establishing that the policy of implementing quotas was the moving force of the constitutional violation involving those adverse employment actions, Plaintiff puts forth the evidence already

---

[274] *See Monell*, 436 U.S. 658, 694 (1978).

discussed that he was disciplined for refusing to comply with the quota system and for speaking out against the quota system. In effect, a reasonable trier of fact could find that the animus of the constitutional violation was the existence of a policy of implementing quota systems. In other words, Plaintiff would not have had anything to speak out against if the policy did not exist, and Defendants would not have had any motivation to unconstitutionally discipline or constructively discharge Plaintiff if Defendants were not in violation of the Louisiana state law prohibiting quotas. Thus, Plaintiff has provided sufficient evidence to raise a question of material fact as to whether the policy of implementing quotas, to the extent one existed, was the moving force of the constitutional violation.

Last, Plaintiff must put forth evidence that the policymaker had actual or constructive knowledge of the alleged policy of implementing quota systems.[275] "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity."[276]

Defendants acknowledge that Chief Lawson is the policymaker of the Gretna Police Department.[277] Plaintiff argues and points to evidence that the "institutionalized and systemic illegal quota system of the Gretna Police Department has been so longstanding and widespread that is [sic] de facto the very custom, policy, practice and usage having the force and effect of law

---

[275] *Cox v. City of Dallas*, 430 F.3d 734, 748–49 (5th Cir. 2005) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

[276] *Pineda v. City of Houston*, 291 F.3d 325, 330 (5th Cir. 2002).

[277] Rec. Doc. 31-1 at 17.

for the police department," including that the policy dates back to 2007.[278] Specifically, Plaintiff

points to the declarations of former officer Heintz and former officer Brouilette as evidence that

Chief Lawson issued a directive to subsidize the loss of revenue from the RedFlex camera system,

presumably by implementing a quota system.[279] During his deposition, Plaintiff also testified that

Vinson informed him that Chief Lawson "the patrol division used $1 million from the money

generated by the RedFlex camera cars . . . . So his goal then or his task was to make the patrol

division financially independent of RedFlex. That conversation led into my sergeant, Danielle

Rodriguez, telling us that we were going to issue three citations a day and make an average of one

arrest every two days worked."[280] As previously discussed, Plaintiff also points to evidence that a

dry erase board displaying a method used by Vinson to track the quota system was in plain view

and visible to all people walking by his office, including Chief Arthur Lawson.[281]

---

[278] Rec. Doc. 35 at 18; Rec. Doc. 35-9 at 1 (citing Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶¶ 11-13).

[279] Rec. Doc. 35-9 at 4 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 21; Rec. Doc. 35-3, (Declaration of Paige Brittany Brouillette) at ¶ 11; Rec. Doc. 35-1(Declaration of David Brian Heintz) at ¶ 23). In former officer Heintz's declaration, he states:

I was present in a meeting in December of 2014, after we had the supervisors meeting when Scott Vinson personally addressed the C team. At the meeting we were told that we needed to subsidize the possible loss of the revenue from the RedFlex Cameras.

Former officer Brouillette likewise states the following in her declaration:

At this December 2014 role [sic] call, Captain Scott Vinson addressed the team stating that we needed to bring more numbers and thus revenue because we were at risk of losing the revenue from the Redflex Camera system. He stated that the police department got $1 millions from the RedFlex Camera system which went to our retirement. Scott Vinson advised us that this directive came directly from the Chief. While Scott Vinson was present Sergeant Heintz told us that we needed to increase productivity by 10%. Sergeant Rodriguez reasserted that we needed to meet exact numbers, which were the quota. We were advised by Captain Scott Vinson that if we did not meet these numbers we would be subject to discipline and could be terminated.

[280] Rec. Doc. 35-9 at 4 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 21.

[281] Rec. Doc. 35-9 at 8 (citing Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶20; Rec. Doc. 35-2 (Declaration of Paul Pichoff); Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 33, Exs. 1, 2).

Furthermore, ensuring compliance with state laws arguably falls within the proper exercise of the Chief of Police's responsibilities. If Chief Lawson had exercised that responsibility, then no quota system could have existed, and no basis for the constitutional violation of retaliation for Plaintiff's speech about a quota system would exist. Accordingly, questions of material fact exist as to whether the policy was so persistent and widespread that Chief Lawson had constructive knowledge, and as to whether ensuring compliance with state laws falls within the proper exercise of Chief Lawson's responsibilities, such that Chief Lawson had constructive knowledge. Thus, based on the evidence put forth by Plaintiff, a reasonable trier of fact could find that the City of Gretna violated 42 U.S.C. § 1983 in retaliating against Plaintiff for exercising his First Amendment right to free speech regarding a quota system.

**B.      *Whether the Defendants are entitled to summary judgment on Plaintiff's Louisiana Whistleblower Statute claims?***

### 1.      Legal Standard

Louisiana Revised Statute 40:2401.1(A) states:

> No municipality or any police department thereof, nor any parish or any sheriff's department thereof, shall establish or maintain, formally or informally, a plan to evaluate, promote, compensate, or discipline a law enforcement officer on the basis of the officer making a predetermined or specified number of any type or combination of types of arrests or require or suggest to a law enforcement officer, that the law enforcement officer is required or expected to make a predetermined or specified number of any type or combination of types of arrests within a specified period.

Section (B) of the statute likewise prohibits police departments from establishing traffic citation quotas.

Louisiana Revised Statute 23:967(A) states, in pertinent part: "An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of

law: (1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law . . . (3) Objects to or refuses to participate in an employment act or practice that is in violation of law." Under Section 23:967(C)(1), "reprisal" includes firing. Section 23:967(B) states: "An employee may commence a civil action in a district court where the violation occurred against any employer who engages in a practice prohibited by Subsection A of this Section. If the court finds the provisions of Subsection A of this Section have been violated, the plaintiff may recover from the employer damages, reasonable attorney fees, and court costs."

### 2.    Analysis

Plaintiff argues that a quota system exists within the Gretna Police Department in violation of Louisiana Revised Statute 40:2401.1, and that he disclosed the unlawful quota system to law enforcement authorities within and outside his agency and department. Plaintiff further argues that his employer engaged in reprisal for his reporting and refusal to participate in the unlawful quota system, in violation of Louisiana Revised Statute 23:967. Defendants argue that Plaintiff has not proven that his employer committed an actual violation of state law, as required by the whistleblower statute to qualify for protection. Specifically, Defendants argue that there was no quota system present at the Gretna Police Department, and therefore there was no actual violation of state law, upon which a whistleblower claim can be based.

Whether the Gretna Police Department established a quota system in violation of Louisiana Revised Statute 40:2401 is a question of material fact. As previously stated, Plaintiff puts forth evidence that a required quota of "10-2-2" was utilized within the Gretna Police Department since at least 2007 and required patrol officers to have at least 10 items, 2 citations, and 2 arrests per

shift, which had to equal to the required total by the end of the month.[282] In support, Plaintiff points to the declaration of former officer Heintz as evidence that he was written up twice in 2007 for "unsatisfactory performance" for failing to meet the required quota at that time of two citations per shift.[283] Plaintiff also points to evidence previously discussed that a shift supervisor was required to keep statistics of subordinate officers which would be given to Captain Scott Vinson.[284] In further support, Plaintiff points to evidence previously discussed that if the required quota was not met, an officer could be written up, suspended, and/or ultimately terminated; and if supervising officers did not enforce the Gretna Police Department's policy, practice, and custom of institutionalized quotas they would also be subject to discipline.[285] Finally, as previously discussed, Plaintiff also points to his deposition testimony, supported by the declarations of former Gretna police officers David Brian Heintz and Paige Brittany Brouillette, as evidence that a quota policy existed in 2014 requiring issuance of three citations a day and an average of one arrest every two days.[286]

Defendants argue that Plaintiff only puts forth evidence of police officer's understanding that a quota system existed, rather than any actual evidence that a quota system existed. However,

---

[282] Rec. Doc. 35-9 at 1 (citing Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶ 17; Rec. Doc. 31-2 (Deposition of Daniel Swear) at 17; Rec. Doc. 35-4 (Declaration of Daniel Wayde Swear) at 40); Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶ 8).

[283] *Id*. (citing Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶¶ 11-13)

[284] *Id*. at 2 (citing Rec. Doc. 35-1 (Declaration of David Brian Heintz) at ¶19; Rec. Doc. 35-2 (Declaration of Paul Pichoff) at 9–11).

[285] *Id*. at 2 (citing Rec. Doc. 35-2 (Declaration of Paul Pichoff); Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶ 7; Rec. Doc. 35-1(Declaration of David Brian Heintz) at ¶ 26; Rec. Doc. 31-2 (Deposition of Daniel Swear) at 20-21, 34, Rec. Doc. 35-4 (Declaration of Daniel Wayde Swear) at 4, 5, 49).

[286] *Id*. at 4 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 21, 28-29, 111-112; Rec. Doc. 35-3 (Declaration of Paige Brittany Brouillette) at ¶¶ 7, 11; Rec. Doc. 35-4 (Declaration of Daniel Swear) at 4, 5, 49).

as previously stated, a police officer's understanding that a quota system existed, though perhaps not dispositive, may be taken as evidence that a quota system did exist. Therefore, Plaintiff has at least raised a disputed issue of material fact as to whether a policy or custom of implementing quota systems by the Gretna Police Department exists.

Plaintiff points to his deposition testimony as evidence that he informed his supervisor, Sergeant Danielle Rodriguez, that the quota system was a violation of Louisiana law following the December 20, 2014 meeting.[287] Furthermore, Defendants do not argue that Plaintiff did not report the violation of law to his employer before disclosing, objecting to, or refusing to participate in the quota system. Plaintiff additionally points to previously discussed evidence that he disclosed the Gretna Police Department's practice of utilizing a quota system to multiple individuals within and outside of the Department.[288] Plaintiff also points to previously discussed evidence that he objected to and refused to participate in the quota, including openly protesting the quota policy to "anyone and everyone," attaching a license plate displaying Louisiana Revised Statute 40:2401 to his car, and refusing to participate in the quota system resulting in a write-up.[289] Defendants do not argue that Plaintiff's disclosure of, objection to, or refusal to participate in the quota policy was not in good faith.

Plaintiff points to previously discussed evidence that he was constructively discharged for speaking out against the quota system. Specifically, Plaintiff points to evidence that Vinson told Plaintiff that "he had a very serious problem with the quote-unquote poison that [Plaintiff] was

---

[287] Rec. Doc. 35-9 at 4 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 104; Rec. Doc. 35-4, (Declaration of Daniel Swear) Exs. 1, 2).

[288] *Id*. at 5 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 47, 101, 132 and 141).

[289] *Id*. at 4 (citing Rec. Doc. 35-4 (Declaration of Daniel Swear) at 24–25, 49).

spreading," at the February 2, 2015 meeting, at which he was demoted.[290] Plaintiff also points to evidence that at the same meeting, Vinson threatened to request termination of Plaintiff's employment, and suggested that he would persist in pursuing Plaintiff's termination if initial attempts were unsuccessful.[291] According to Plaintiff's deposition testimony, "There was a heavy emphasis on [Plaintiff] spreading poison of this quota system. That was the focus of [the meeting]."[292] Plaintiff also stated in his deposition, "voicing my opinion and my concern for the legality of the issue, that that's when [Vinson] started speaking about [] requesting that I be fired and if he didn't get it this time that he would get it in subsequent requests."[293]

In addition, according to Plaintiff's deposition testimony, he was contacted by the head of the Gretna Police Department's Internal Affairs Bureau while still employed at the Gretna Police Department and informed that he needed to remove the license plate from the vehicle if he wanted to remain a member of the Gretna Police Department. Last, Plaintiff states in his deposition testimony that Vinson told Plaintiff at a February 9, 2015 meeting that Plaintiff could either resign immediately, or he would be terminated and investigated for making defamatory statements against the Gretna Police Department.[294] Given the evidence Plaintiff has provided regarding incidents of reprimand or threatened termination taken while or soon after Plaintiff was criticized by Gretna Police Department personnel for his speech about the quotas, a reasonable trier of fact could find that the Gretna Police Department took reprisal against Plaintiff after he disclosed the

---

[290] Rec. Doc. 47 at 3 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 100–01).

[291] *Id*. at 4.

[292] *Id*. at 3–4 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 105).

[293] *Id*. at 4 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 105).

[294] Rec Doc. 47 at 5–6 (citing Rec. Doc. 31-2 (Deposition of Daniel Swear) at 53–54).

illegality of the quota system and objected to and refused to participate in it.

Accordingly, Plaintiff has raised a question of material fact as to whether he suffered reprisal by the Gretna Police Department for disclosing the quota system and objecting to and refusing to participate in the quota system, not appropriate for determination at the summary judgment stage.

## IV. Conclusion

For the reasons set forth above, Lawson is entitled to qualified immunity, which precludes liability in his personal capacity, because there is no record evidence that he was involved in any alleged violation of Plaintiff's constitutional rights. Further, Plaintiff's Section 1983 First Amendment claim against Lawson and Vinson, in their official capacities, will be dismissed because it mirrors Plaintiff's Section 1983 claim against the City of Gretna, and such duplicative claims are prohibited by law. Defendants' motion for summary judgment with respect to Plaintiff's Fourteenth Amendment claim is also granted in favor of all Defendants and against Plaintiff, as Plaintiff abandoned the claim during the hearing on October 11, 2017.

However, Defendants' motion for summary judgment with respect to Vinson's qualified immunity defense will be denied because an issue of material fact exists as to whether Vinson violated Plaintiff's constitutional right to speak out against the alleged quota system, and whether his actions in doing so were objectively reasonable. Defendants' motion for summary judgment with respect to Plaintiff's First Amendment claim against Defendant Scott Vinson, in his personal capacity, will also be denied because there is an issue of material fact as to whether Defendant constructively discharged Plaintiff in violation of his First Amendment right to be free from retaliation for engaging in protected speech. Finally, Defendants' motion for summary judgment

with respect to Plaintiff's Section 1983 First Amendment claim against the City of Gretna will also be denied because there is an issue of material fact as to whether the Gretna Police Department constructively discharged Plaintiff in violation of his First Amendment right to be free from retaliation for engaging in protected speech, and as to whether any such constructive discharge was caused by the Department's custom of implementing a quota system.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment[295] is **GRANTED**, **in part,** in favor of Defendant Arthur Lawson against Plaintiff with respect to Defendant Arthur Lawson's qualified immunity defense.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**, **in part,** in favor of Defendants Arthur Lawson and Scott Vinson against Plaintiff with respect to Plaintiff's Section 1983 First Amendment claim against Defendants Arthur Lawson and Scott Vinson, in their official capacities.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**, **in part,** in favor of all Defendants with respect to Plaintiff's Fourteenth Amendment claim against all parties.

---

[295] Rec. Doc. 31.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment is **DENIED**, **in part,** with respect to Defendant Scott Vinson's qualified immunity defense, Plaintiff's First Amendment claim against Defendant Scott Vinson, in his personal capacity, and Plaintiff's Section 1983 First Amendment claim against the City of Gretna.

**NEW ORLEANS, LOUISIANA**, this __12th__ day of January, 2018.

_Nannette Jolivette Brown_
**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**